STATE of North Dakota, Plaintiff
and Appellee,

v.

Paul SHAVER, Defendant and Appellant.

STATE of North Dakota, Plaintiff
and Appellee,

v.

Dennis STEINWAND, Defendant
and Appellant.

Crim. Nos. 705, 706.

Supreme Court of North Dakota.

June 20, 1980.

The defendants, Paul Shaver and Dennis Steinwand, are members of the Bible Baptist Church, a nonprofit corporation located in Bismarck, North Dakota. Shaver, Steinwand, and their families reside in the city of Mandan, North Dakota, within the Mandan Public School District. North Dakota's compulsory school attendance law required them to send their children to a public school or an approved private or parochial school in the state.[1] None of their children were enrolled in a public school during the 1979–1980 school year, nor in any other approved private or parochial school in the state. Further, the children did not fall within a recognized exception to the compulsory school attendance law. *See* Section 15–34.1–03, N.D.C.C. Instead, the evidence shows that the defendants' children attended the Bible Baptist School in Bismarck, a non-approved fundamental Baptist school.

The evidence adduced at trial reveals that the Bible Baptist School began operation in January of 1979. The Reverend Mr. Rodell Bledsoe is principal of the school and has been pastor of the Bible Baptist Church since July of 1979. We shall hereafter refer to him as Pastor.

Pastor Bledsoe testified as to the fundamental precepts of the religion observed by the members of the Bible Baptist Church. He said that the purpose of the church was "to evangelize the world and reach the lost" and "to teach the Christian after they have been saved and born again." According to Paster Bledsoe, members of the Bible Baptist Church believe that the Bible mandates and commands parents to educate their children according to God's word and in a manner consistent with the teachings of the Bible. They believe it is their God-given responsibility as parents to teach and train their children and bring them up in the nurture and admonition of the Lord. *See*

Thomas Tuntland, State's Atty., Mandan, for plaintiff and appellee.

Fleck, Mather, Strutz & Mayer, Bismarck, and Charles E. Craze, Cleveland, Ohio, for defendants and appellants; appearances by Thomas A. Mayer, Bismarck, Charles E. Craze and David Gibbs, Cleveland, Ohio, argued by Charles E. Craze, Cleveland, Ohio.

ERICKSTAD, Chief Justice.

The defendants appeal from judgments of conviction entered in the Morton County Court with Increased Jurisdiction on December 18, 1979. The convictions arose out of the defendants' failure to comply with the requirements of the compulsory school attendance law, Chapter 15–34.1, N.D.C.C. This appeal challenges the constitutionality of that law as applied to the defendants. We affirm.

1. "15–34.1–01. *Compulsory attendance.*—Every parent, guardian, or other person who resides within any school district, or who resides upon any government base or installation without any school district, and has control over any educable child of an age of seven years to sixteen years who does not fall under the provisions of sections 15–34.1–02 or 15–34.1–03, shall send or take such child to a public school

Proverbs 22:6.[2] Steinwand testified that "it is my duty to train up my child as it says in the Bible; train up a child in the way he should go. And I feel this is my conviction, because I do believe the Bible and everything it stands for." Shaver's testimony was in accord with Steinwand's and he stated that the scriptures mandate that parents educate their children in Christian schools. Shaver also testified in detail as to the basis and foundation for his religious convictions regarding the education of his children.

The State does not dispute the sincerity of the defendants' religious beliefs and convictions.

According to Pastor Bledsoe, the Bible Baptist School was established to fulfill the biblical command which church members believe requires the education of their children in a Christian environment. Pastor Bledsoe testified that:

"The very purpose of starting [the Bible Baptist School] was to have a Christian education. The four basic subjects by themselves are taught in public schools, so it wasn't because of the four basic subjects, nor was it the success or failure of the public school. What we wanted to do was teach our Christian convictions, principles, doctrines of believing, and this we can best do through this Christian school as well as teach the four basic subjects as required."

As previously stated, the Bible Baptist School opened its doors in January of 1979. The school utilizes a curriculum nationally known as the Accelerated Christian Education program (ACE). The ACE method of instruction is a self-study program whereby students work at their own speed and progress through a series of learning packets on varying subjects, referred to as "paces". The ACE program is Bible-orientated in that passages from scripture are contained within the teaching materials. Each student is generally expected to complete at least 12 paces in each subject per year. One hundred forty-four paces is equivalent to the completion of 12 grades.

Pastor Bledsoe testified that the ACE curriculum is currently being used in approximately 3,000 church schools throughout the United States. An additional 500 to 1,000 new schools are expected to utilize the curriculum when their doors open in 1980. In addition to the Bible Baptist School, there are three other church schools in North Dakota which employ the ACE method of instruction. Ronald C. Stastney, Director of Elementary Education for the Department of Public Instruction, testified that he was familiar with the ACE curriculum and believed that the materials were good and the curriculum was sound. However, he further said that "some average children may not be able to learn through that process of self-study" and that a teacher may have to employ a different style of instruction to teach those children.

The record discloses that the Bible Baptist School does not employ teachers who are certified by the state of North Dakota. The ACE curriculum does not require certified teachers nor does the school have a certified teacher on its staff. The educational qualifications of the church school's teachers are not revealed in the record; however, the following answer to an inquiry which sought to learn why they were not certified is significant:

"A. Well, perhaps twofold. Number one, the curriculum does not require a certified teacher. Number two, of course, naturally the ladies have not completed the required education. Number three, we don't certify our Sunday School teachers either, and we feel that these same ladies function in our Sunday School on Sunday. The same kids are in Sunday School on Sunday. The same ladies and kids are in Monday school and Tuesday school, and so forth."

Pastor Bledsoe testified that the basic and fundamental requirement to teach at the Bible Baptist School is that the "teacher

each year during the entire time such school is in session."

2. "Train up a child in the way he should go; and when he is old, he will not depart from it." *Proverbs* 22:6 (Scofield Reference Edition).

be saved and born again." According to Pastor Bledsoe, a teacher must lead an exemplary life and maintain good standing in the church. During cross-examination, Pastor Bledsoe indicated that a certified teacher could conduct the ACE method of instruction in the church school without violating the basic tenets of the religion *if* the teacher had been saved and born again. He admitted that there were certified teachers who could meet that basic requirement.

The record further discloses that the Bible Baptist School has never sought approval by the County Superintendent of Schools and the Superintendent of Public Instruction as required by statute. *See* Section 15–34.1–03(1), N.D.C.C. Further, the record reveals that the school will not seek to obtain such approval in the future. The view of the church is indicated by this testimony of Pastor Bledsoe:

> "[W]e don't want approval, because we feel it's a matter of state control. Jesus said in Matthew, Chapter 16, 'I will build my church, and the gates of hell will not prevail against it.' We believe the head of the Church is Jesus Christ, and if I let the State become head of the Church, then I will be removing the Lord from His position, and this Church is definitely built on the Lord, Jesus Christ."

The testimony of Shaver and Steinwand is in accord with Pastor Bledsoe's testimony relative to the church members' religious convictions against obtaining state approval. The following colloquy between Steinwand and the state's attorney reveals this conviction:

> "Q. Would it actually be against your religious principles to seek state approval of the school?
> "A. Yes, it would.
> "Q. And why would that be, sir?
> "A. Well, in the Bible, it tells us that we are to obey Supreme Power which is God, and that's what the church and the church school does. Now, if the state was to say you have to approve teachers, and that means that the supreme power we would listen to would be the state.

> "Q. So you feel that it—would it be strongly against your religious convictions—
> "A. Absolutely.
> "Q. —to seek approval of the school, even if approval could be granted?
> "A. I feel if—I feel that the supreme power is God, and I feel if he approves the church, that is the arm of the church, he approves the school.
> "Q. Okay. I guess I'll just repeat the question. It would be against your religious convictions to seek state approval of the school which Todd is currently attending; is that correct?
> "A. Yes, sir."

Children at the church school are periodically tested to determine not only their level of achievement within the ACE curriculum, but also their overall level of achievement as reflected in the results of the administration of the California Achievement Test. The uncontroverted evidence shows that many of the children have displayed remarkable progress since the school doors opened in January 1979. Pastor Bledsoe testified that the majority of the students who entered the church school from the public schools in 1979 were behind in their grade levels as indicated by their results on the California Achievement Test. However, the periodic administration of the achievement test has disclosed that many of the students have now attained the grade level they should be working at and several students are working at a grade level far above the norm. As Pastor Bledsoe stated, "Our curriculum has advanced to the place where year for year we are actually somewhat ahead of the public school." The State does not dispute this evidence.

█ The defendants, Shaver and Steinwand, were convicted in the Morton County Court with Increased Jurisdiction on December 18, 1979, of violating North Dakota's compulsory school attendance law, Chapter 15–34.1, N.D.C.C. A violation of this law is an infraction. *See* Section 15–34.1–05, N.D.C.C. The judgment provided that there should be no fine and no costs assessed. Incarceration is not permissible

in conjunction with conviction of an infraction except under circumstances described in Section 12.1–32–01(7), N.D.C.C.[3] Judgments of conviction were entered on December 18, 1979, and the defendants appeal to this court from said judgments.

■ The crucial issue on appeal is whether or not North Dakota's compulsory school attendance law, as applied to the defendants, violates the free exercise of religion, contrary to the First Amendment to the United States Constitution. The defendants in this appeal, whom we shall hereafter refer to as the parents, are not challenging the constitutionality of the law on its face, but rather in its application to them. An attack of the compulsory school attendance law on its face would have to overcome the presumption of constitutionality that adheres to all legislative enactments. See Shaw v. Burleigh County, 286 N.W.2d 792 (N.D.1979); Dorgan v. Kouba, 274 N.W.2d 167 (N.D.1978). The parents contend that the operation of the Bible Baptist School is an integral part of the ministry of its supporting church, and that the compulsory school attendance law, which requires their children to be in attendance at a public school or at an approved private or parochial school, infringes upon their religious liberties and, therefore, violates the First and Fourteenth Amendments to the United States Constitution.

The First Amendment of the United States Constitution, applicable to the state of North Dakota through the Fourteenth Amendment, prevents the enactment of laws respecting an establishment of religion or prohibiting the free exercise thereof. U.S.Const. amends. I and XIV; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); see N.D.Const. § 4.

The problem of balancing an individual's rights under the Free Exercise Clause of the First Amendment against the state's general interest in the health, safety, and welfare of its citizens is a perplexing one. Currently garnering attention throughout the country are various religious schools that have refused to comply with state approval and accreditation requirements, often resulting in the state's attempt to either close the schools or prosecute the parents for violations of the particular compulsory school attendance laws or both. These conflicts raise serious constitutional issues which require an examination of relevant United States Supreme Court decisions which have involved free exercise issues under the First Amendment.

■ At the outset, it is important to recognize that when a statute imposes a burden on religion, the statute is not automatically unconstitutional. The freedom to hold religious beliefs and opinions is absolute. Cantwell v. Connecticut, supra. However, as the United States Supreme Court said in Braunfeld v. Brown, 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563, 566 (1961): "[T]he freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions." This traditional "belief-action" distinction in the area of religious free exercise has been recognized in prior cases which have held that while religious beliefs are constitutionally protected from state interference, actions motivated by those beliefs are not immune from regulation. See Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed.

---

3. "12.1-32-01. Classification of offenses— Penalties. Offenses are divided into seven classes, which are denominated and subject to maximum penalties, as follows:

    *   *   *   *   *   *

7. Infraction, for which a maximum fine of five hundred dollars may be imposed. Any person convicted of an infraction who has, within one year prior to commission of the infraction of which he was convicted, been previously convicted of an offense classified as an infraction may be sentenced as though convicted of a class B misdemeanor. If the prosecution contends that the infraction is punishable as a class B misdemeanor, the complaint shall specify that the offense is a misdemeanor.

This section shall not be construed to forbid sentencing under section 12.1–32–09, relating to extended sentences." § 12.1–32–01, N.D. C.C.

645 (1944); *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1879). Nevertheless, courts must move with circumspection in performing the difficult and sensitive task of striking the delicate balance between the free exercise of religious liberties and the pursuit of reasonable governmental regulations.

In *Braunfeld v. Brown, supra*, the Court was faced with the claims of orthodox jewish merchants that Pennsylvania's Sunday closing laws interfered with the free exercise of their religion by imposing serious economic disadvantages upon them if they adhered to the observance of their Sabbath. The Court held that the Sunday closing laws were valid since their effect on religious activity was only indirect. 366 U.S. at 605–09, 81 S.Ct. at 1146–1149. The Supreme Court found that if a state enacts a law within its regulatory power, and its purpose and effect is to advance a secular goal (one uniform day of rest for all workers), the statute is valid despite its indirect burden on religion, unless the same secular goal may be achieved by other means which do not impose such a burden. 366 U.S. at 607, 81 S.Ct. at 1148.

The *Braunfeld* Court determined that the burden upon the orthodox jewish merchants was merely an indirect one, *i. e.*, the regulation did not make the religious practice unlawful, but instead, operated to make the practice more difficult or expensive. 366 U.S. at 605, 81 S.Ct. at 1146. Governmental regulations which actually prohibit the exercise of religious belief, whereby the individual has a choice of either abandoning his religious practice or face criminal prosecution, are deemed to be "direct" burdens. *Id.*

Similarly, in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court considered whether or not a state could constitutionally deny a Seventh-Day Adventist unemployment compensation benefits because of her religiously-motivated refusal to work on Saturdays.

The appellant in *Sherbert* had been discharged by her employer for her refusal to work on Saturday, the Sabbath day of her faith. She was unable to obtain other employment and filed a claim for unemployment compensation benefits. The South Carolina Unemployment Compensation Act provided that a claimant would be ineligible for benefits if he failed, without good cause, to accept available suitable work when offered. The appellant's refusal to work on Saturday caused her to fail to meet the statutory requirement of being available for work and she was denied benefits.

Although the Court did not find that the burden caused by the state action was a direct one, it said that the regulation "forces her [the appellant] to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." 374 U.S. at 404, 83 S.Ct. at 1794.

In determining when such a regulation is justified, the *Sherbert* Court concluded that if the statute is to be constitutionally applied to the appellant:

"it must be either because her disqualification as a beneficiary represents no infringement by the State of her constitutional rights of free exercise, or because any incidental burden on the free exercise of appellant's religion may be justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate . . .'" 374 U.S. at 403, 83 S.Ct. at 1793, *quoting N.A.A.C.P. v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 341, 9 L.Ed.2d 405, 421 (1963).

The Supreme Court then went on to define a "compelling state interest":

"It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation.'" 374 U.S. at 406.

No such compelling state interest was advanced in *Sherbert* as the statutory scheme which existed in South Carolina

provided exemptions for Sunday worshippers under certain conditions. Therefore, the state could not claim a compelling interest in application of its unemployment compensation laws without exemption. Further, no interest was advanced other than a suggestion of a possibility that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work might dilute the unemployment compensation fund, as well as hinder the scheduling by employers of Saturday work. The Court expressed some doubt if such evidence, even if supported in the record, would be sufficient to warrant a substantial infringement of religious liberties. 374 U.S. at 407, 83 S.Ct. at 1795.

The *Sherbert* decision broadened the coverage of the free exercise clause and increased the state's burden to justify infringements on the free exercise of religion. *Sherbert* required a two-step analysis in determining whether or not a statute, as applied to a particular individual, violated the First Amendment. First, the court must determine if the application of the statute constitutes an infringement upon the individual's religious liberty, and second, if an infringement exists, the court must then determine if it is justified by a "compelling state interest."

■ Both direct and indirect burdens on the free exercise of religion require a balancing of the burden on the individual's religious interest with the importance or compelling nature of the state's interest. Also to be examined are alternative means by which the state could achieve its objective through the imposition of a lesser burden on religion. This analysis or balancing-test approach to governmental infringements of religious liberties was employed by the Court in the landmark decision relied upon by the parents in the case at bar, *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

In *Yoder*, the United States Supreme Court was faced with the issue of whether or not Wisconsin's compulsory school attendance law unconstitutionally infringed on the free exercise of the Amish children's parents' religious beliefs. The Amish parents had been convicted in state circuit court of violating the compulsory school attendance law, but the Supreme Court of Wisconsin reversed the convictions and held that the law impinged on the parents' First Amendment rights. *State v. Yoder*, 49 Wis.2d 430, 182 N.W.2d 539 (1971). The United States Supreme Court thereafter granted the state's petition for writ of certiorari.

The Supreme Court in *Yoder* held that the First and Fourteenth Amendments to the United States Constitution prevent a state from compelling Amish parents to cause their children, who have been graduated from the eighth grade, to attend formal high school to age 16. 406 U.S. at 234–35, 92 S.Ct. at 1542–1543.

To resolve the conflict between the state's interest in the field of education with other fundamental rights and interests, such as those protected by the free exercise clause of the First Amendment and the traditional interest of parents with respect to the religious upbringing of their children, the United States Supreme Court in *Yoder* engaged in a balancing test through the application of the *Sherbert* two-pronged analysis as well as a consideration of the historical development and success of the religious order in question (the Amish). In *Yoder*, the Court formulated a three-pronged inquiry to determine whether or not Wisconsin's compulsory school attendance law was unconstitutional as applied to the Amish parents. The three-pronged analysis was not designated a test as such by the Supreme Court for there has never been a clear and pronounced free exercise test or standard for determining when governmental infringements of religious liberties violate the First Amendment. The constitutional analysis of cases arising under the free exercise clause is generally tailored to the particular factual situation at hand. This approach is different from the Court's analysis in cases arising under the establishment of religion clause of the First Amendment, where a well-enunciated and broadly applicable test

has been established. *See Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *See also Grace Lutheran Church v. North Dakota Employment Security Bureau*, 294 N.W.2d 767 (N.D.1980).

The three-pronged analysis in *Yoder* involved a determination of (1) whether or not the activity interfered with by the state is motivated by and rooted in a legitimate and sincerely-held religious belief, 406 U.S. at 215–216, 92 S.Ct. at 1533–1534; (2) whether or not the parties' (the Amish) free exercise of religion had been burdened by the regulation, and the extent or impact on their religious practices, *Id.* at 217–219, 92 S.Ct. at 1534–1535; and (3) whether or not the state had a compelling interest in the regulation which justified the burden on the free exercise of religion and overrode the interest of the Amish parents in exercising their religious practices, *Id.* at 219–34, 92 S.Ct. at 1535–1542. We will apply the constitutional analysis and approach utilized in *Yoder* to the instant case.

### NATURE OF THE BELIEF

■ With respect to the first prong of this analysis, the Court in *Yoder* sought to determine whether or not the Amish religious faith and their mode of life were in fact "inseparable and interdependent." 406 U.S. at 215, 92 S.Ct. at 1533. The Court said that "[A] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations . . . ." *Id.* Activity motivated solely by philosophical or personal considerations, rather than religious beliefs, falls outside the scope of the protections afforded by the free exercise clause of the First Amendment. *Id.* The Court determined that "the traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." 406

U.S. at 216, 92 S.Ct. at 1533. Therefore, the Amish parents in *Yoder* satisfied the first prong of the free exercise analysis.

■ In the case at bar, the defendants, Paul Shaver and Dennis Steinwand, are fundamental Baptists, members of the Bible Baptist Church in Bismarck. The record shows that their religious belief mandates that children be educated according to God's word and in a manner consistent with the teachings of the Bible. To fulfill this command, the Bible Baptist School began operation in January of 1979 as an integral and inseparable part of the ministry of the Bible Baptist Church. As the State has conceded that the parents have met this first prong of the inquiry, we need not further address this question. The second inquiry of the *Yoder* analysis, however, presents a more difficult dilemma.

### DEMONSTRATION OF UNDUE BURDEN

The next prong of our inquiry is if, and to what extent, the individual's rights of free exercise of religion have been burdened by the regulation, i. e., the compulsory school attendance law. The applicable standard of this prong of the inquiry was succinctly stated in *Abington School Dist. v. Schempp*, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844, 858 (1963):

> "[I]t is necessary in a free exercise case for one to show the *coercive* effect of the enactment as it operates against him in the practice of his religion." (Emphasis added.)

In *Yoder*, the United States Supreme Court determined that Wisconsin's requirement of compulsory formal education *beyond the eighth grade* would gravely endanger, if not destroy, the free exercise of the Amish parents' religious beliefs. 406 U.S. at 219, 92 S.Ct. at 1535.

The Amish mode of life in a church-oriented, rural community, separated from the outside world and all "worldly" influences, had remained virtually unchanged for centuries. The record in *Yoder* revealed that the Amish objected to formal education be-

yond the eighth grade. They believed that the values transmitted to their children through secondary school education were in marked variance with Amish values. The Amish objected to all forms of secondary education and viewed such education as "an impermissible exposure of their children to a 'worldly' influence in conflict with their beliefs." 406 U.S. at 211, 92 S.Ct. at 1531. The record indicated that the Amish had no objection to elementary education through the eighth grade because they recognized that their children needed the basic skills ("three R's") in order to function in society. Further, a basic education was deemed to be an insignificant exposure to worldly values. *Id.* at 212, 92 S.Ct. at 1531.

The Court in *Yoder* said:

"So long as compulsory education laws were confined to eight grades of elementary basic education imparted in a nearby rural school house, with a large proportion of students of the Amish faith, the Old Order Amish had little basis to fear that school attendance would expose their children to the worldly influence they reject. But modern compulsory secondary education in rural areas is now largely carried on in a consolidated school, often remote from the student's home and alien to his daily home life. As the record so strongly shows, the values and programs of the modern secondary school are in sharp conflict with the fundamental mode of life mandated by the Amish religion; modern laws requiring compulsory secondary education have accordingly engendered great concern and conflict. *The conclusion is inescapable that secondary schooling, by exposing Amish children to worldly influences in terms of attitudes, goals, and values contrary to beliefs, and by substantially interfering with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development, contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child.*" (Emphasis added.) 406 U.S. at 217–18, 92 S.Ct. at 1534.

The *Yoder* Court thereafter determined that the impact of Wisconsin's compulsory school attendance law on Amish religious practices was severe and inescapable because the law required the Amish parents "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." 406 U.S. at 218, 92 S.Ct. at 1534. A close examination of the record to determine the effect of the requirements for state approval upon the religious practices of the parents sending their children to the Bible Baptist School fails to reveal an impact of similar magnitude.

The analysis of any claim of an infringement upon the free exercise of religion must focus on the actual burden imposed by the particular regulation or regulations. It is incumbent upon the challenger to the statute to show the coercive effect of the enactment on the practice of religion. *See Abington School Dist. v. Schempp, supra.* The degree of the burden on the religious practice is an important consideration which the United States Supreme Court in *Yoder* went to great lengths to emphasize. The Supreme Court distinctly pointed out that compulsory school attendance for the Amish beyond the eighth grade would not merely offend "important Amish religious tenets from a subjective point of view," but would pose "a very real threat of undermining the Amish community and religious practice as they exist today." 406 U.S. at 218, 92 S.Ct. at 1534.

It is incumbent upon the parents to demonstrate the manner in which the state's minimum requirements or standards for state approval infringe upon the free exercise of their religious liberty. In this case, the parents' contention is that in requiring the school to seek approval of the County Superintendent of Schools and the Superintendent of Public Instruction, their right to free exercise of religion is unduly infringed.

North Dakota's compulsory school attendance law, Chapter 15-34.1, N.D.C.C., provides that if an educable child between the ages of seven and sixteen years does not fall under the provisions of Sections 15-34.-

1–02 or 15–34.1–03, N.D.C.C. said child must attend a public school. Section 15–34.1–01, N.D.C.C. Section 15–34.1–02, N.D.C.C., provides an exception for deaf, blind, or mentally deficient children and is not applicable to this appeal. Section 15–34.1–03, however, is relevant and in pertinent part provides as follows:

"15–34.1–03. Compulsory attendance—Exceptions. The parent, guardian, or other person having control of a child required to attend school by the provisions of this chapter shall be excused by the school board from causing the child to attend school whenever it shall be shown to the satisfaction of the board, subject to appeal as provided by law, that one of the following reasons exists:

1. That the child is in attendance for the same length of time at a parochial or private school approved by the county superintendent of schools and the superintendent of public instruction. No such school shall be approved unless the teachers therein are legally certificated in the state of North Dakota in accordance with section 15–41–25 and chapter 15–36, the subjects offered are in accordance with sections 15–38–07, 15–41–06, and 15–41–24, and such school is in compliance with all municipal and state health, fire and safety laws." § 15–34.1–03(1), N.D.C.C.

The language of the regulation challenged is facially neutral; however, the pertinent inquiry under *Yoder* is whether or not "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." 406 U.S. at 220, 92 S.Ct. at 1536.

To obtain state approval of a private or parochial school in North Dakota, a school must meet the following minimum requirements set forth in Section 15–34.1–03(1), N.D.C.C., namely:

(1) The teachers must be legally certified in the state of North Dakota in accordance with Section 15–41–25 [4] and Chapter 15–36, N.D.C.C.;

(2) The subjects offered must be in accordance with Sections 15–38–07, 15–41–06, and 15–41–24, N.D.C.C.; and

(3) The school must be in compliance with all municipal and state health, fire, and safety laws.

The record reveals that the tenets of the Bible Baptist Church do not forbid a public school education. Pastor Bledsoe's testimony indicates that it is not a basic violation of the doctrinal beliefs of the Bible Baptist Church of Bismarck for a church member to send a child to a secular school. The record further reveals that Defendant Steinwand's child attended public school through the first grade and into the second grade until such time as Steinwand became dissatisfied with the education and values received by his boy in the public school system. Although the tenets of the Bible Baptist Church do not forbid public school education, the Church is vehemently opposed to securing state approval required by state law. No attempt was made at the trial to show how compliance with the law would affect the religion of the parents or their children.

Of principal concern and discussion at the trial was the requirement that teachers be certified in North Dakota in order for a parochial or private school to obtain state approval. The Bible Baptist School employs no certified teachers and the ACE curriculum requires no teacher certification. The basic and fundamental requirement to teach at the church school is that a teacher be, in Pastor Bledsoe's words, "saved and

4. "15–41–25. *High schools—Teacher qualification*——. Not later than July 1, 1961, every teacher in any high school in this state teaching any of the course areas or fields mentioned in section 15–41–24 shall have a valid teacher's certificate and shall have a major or minor in the course areas or fields that he is teaching if such high school is to receive any approval by the department of public instruction. However, a teacher granted a certificate to teach in the disciplines of trade, industrial, technical, and health under chapter 15–20.1 and possessing neither a major nor a minor in the field in which he is employed shall not affect the approval of the employing school district."

born again." A perusal of the record, however, fails to disclose a deeply-rooted religious conviction against the use of certified teachers in the Bible Baptist School. The following colloquy between Pastor Bledsoe and the state's attorney on cross-examination reveals the absence of such conviction:

"Q. Is there anything that would prohibit—that would keep a certified teacher from instructing in the method that you have right now?

"A. With the particular curriculum we have, it in fact could be done with a certified teacher. The particular requirements of it—that would require a teacher—they require a supervisor and monitors trained according to accelerated Christian guidelines, and those supervisors and monitors have been trained in that fashion.

"Q. But the actual instruction could be conducted by a certified teacher without violating the basic tenets of your religion, isn't that correct?

"A. If that certified teacher—again with the basic requirements for being an instructor in the school is for a person to be saved and born again.

"Q. Okay. Saved and born again. If I could use that as a shorthand, that would be someone who practices your faith or a faith substantially similar?

"A. It's a person who at one time recognized they were a sinner and needed the Lord Jesus Christ, the savior, and one time in their life they invited Christ to come in, and that experience is real.

"Q. And it would be possible for a college graduate to be saved and born again?

"A. There are a lot of college graduates that are saved and born again.

"Q. It would be possible for a certified teacher to be saved and born again?

"A. Right.

"Q. And I would presume that there are numerous certified teachers who are saved and born again?

"A. I'm sure there are."

Counsel for the defendants has strongly argued that because the students are presently receiving a good education, the teacher certification requirement is unwarranted. A person to be certified must have certain educational training. See especially Chapter 15–36, N.D.C.C., for grade school teachers. We recognize that certification does not necessarily equate with teaching competence in every instance, but we believe it is a reasonable tool and one which the Legislature may utilize in attempting to assure not only for the present, but for the future, quality education for all children in conjunction with carrying out the mandate of the state constitution.

The second requirement for state approval is that subjects offered must include those set forth in the statutes. None are of a religious nature and none are contended to be. The record in the instant case is devoid of evidence to show that the tenets of the Bible Baptist Church forbid the teaching of courses prescribed by any statute.

The ACE curriculum, which is utilized by the Bible Baptist School, is a nationally-recognized and widely used program, employed by approximately 3,000 church schools throughout the country. The record indicates that Ronald C. Stastney, Director of Elementary Education for the Department of Public Instruction, was of the opinion that the ACE curriculum would meet state curriculum requirements, and Stastney's testimony on direct examination is supportive of this statement:

"Q. Sir, in closing, would you say it would be a fair statement to make, just to summarize what we have been talking about, when we're talking about—you say the problem with this particular school, these particular defendants is they have noncertified teachers, that the curriculum as far as you can see—the ACE curriculum—is substantial in nature, and if you have someone there who could somehow give it to these children, then it would be approvable?

"A. Yes."

It is, therefore, highly unlikely that the ACE program would be affected in the process of securing approval of the school.

The final requirement for state approval of a parochial or private school is compliance with all municipal and state health, fire, and safety laws. No assertion has been made that this requirement impinges on the defendants' free exercise of religion, nor does the record reveal whether or not the Bible Baptist School is complying with such laws.

It appears that while the principles, beliefs, and doctrines held in common by members of the Bible Baptist Church oppose the essential requisite that the Bible Baptist School obtain state approval in order to comply with the compulsory school attendance law, the tenets of their religion do not forbid compliance with any of the specific requirements needed to obtain that approval.

Pursuant to Section 15–34.1–03, N.D.C.C., a parochial or private school must be approved by the County Superintendent of Schools and the Superintendent of Public Instruction. As the parents have failed to show that the tenets of their religion forbid compliance with the *specific* requirements needed to obtain state approval, it is difficult for us to understand their objection to seeking approval. Nevertheless, the parents contend that requiring the Bible Baptist School to seek state approval violates the tenets of their religion and imposes an impermissible and substantial burden on the free exercise thereof. For the sake of argument, we assume that this requirement is a burden upon the free exercise of their religion.

## COMPELLING STATE INTEREST

■ The third prong of our inquiry is whether or not the state has a compelling interest in the compulsory school attendance regulation which justifies the burden imposed on the free exercise of religion. Inherent in this analysis is a determination of whether or not the least restrictive or "less drastic" means to accomplish the objective have been utilized. *See United States v. Robel*, 389 U.S. 258, 269, 88 S.Ct. 419, 426, 19 L.Ed.2d 508, 516 (1967).

The United States Supreme Court in *Yoder* recognized that a state has an interest in educating its youth:

"There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education. See, *e. g., Pierce v. Society of Sisters*, 268 U.S. 510, 534, [45 S.Ct. 571, 69 L.Ed. 1070] (1925). Providing public schools ranks at the very apex of the function of a State." 406 U.S. at 213, 92 S.Ct. at 1532.

Indeed, there are a long line of cases which have recognized the importance of education, culminating in the famous *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) decision wherein the Court said:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

*See Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

■ The Constitution of North Dakota recognizes that "a high degree of intelligence, patriotism, integrity and morality on the part of every voter in a government by

the people" is necessary "in order to insure the continuance of that government and the prosperity and happiness of the people." N.D.Const. § 147.

Section 149 of our State Constitution further provides that:

"*Section 149.* In all schools instruction shall be given as far as practicable in those branches of knowledge that tend to impress upon the mind the vital importance of truthfulness, temperance, purity, public spirit, and respect for honest labor of every kind."

In addition thereto, Section 151 of our State Constitution provides as follows:

"*Section 151.* The legislative assembly shall take such other steps as may be necessary to prevent illiteracy, secure a reasonable degree of uniformity in course of study, and to promote industrial, scientific, and agricultural improvements."

The Legislature, under this state constitutional mandate, is authorized to regulate the educational system and to prescribe the necessary courses of study. *State v. Totten,* 44 N.D. 557, 175 N.W. 563 (1919).

The importance of the state's interest in the field of education certainly cannot be denigrated. However, the *Yoder* Court recognized that this legitimate state interest must be balanced against an infringement upon the fundamental free exercise of religious practices when it said:

"Thus, a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce,* 'prepare [them] for additional obligations.' 268 U.S., at 535, 45 S.Ct. 571." 406 U.S. at 214, 92 S.Ct. at 1532.

The United States Supreme Court further held that "however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests." 406

U.S. at 215, 92 S.Ct. at 1533. Although the state's interest in education, and its concomitant regulatory authority must be respected, the Court's expression that such interest is never absolute found favor in the early case of *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

*Pierce* involved an initiative which had been approved by the voters of Oregon and required, with certain exemption, that every parent, guardian, or other person having control of a child between the ages of eight and sixteen years send him to a *public* school. The United States Supreme Court declared the Oregon Compulsory Education Act of 1922 violative of the Fourteenth Amendment as an unreasonable interference with the liberty of parents to direct the upbringing of their children. 268 U.S. at 534, 45 S.Ct. at 573. The Court held that:

"Under the doctrine of *Meyer v. Nebraska,* 262 U.S. 390, [43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1146], we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 U.S. at 534–35, 45 S.Ct. at 573.

However, the *Pierce* Court also recognized that parental rights are subject to the reasonable rights of the state:

"to regulate all schools, to inspect, supervise and examine them, their teachers

and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare." 268 U.S. at 534, 45 S.Ct. at 573.

■ The State of North Dakota has a recognized and *conceded* interest in assuring the sufficient education of the children of the residents of the state to enable them to be viable citizens in the community. If the state is to satisfy its interest in secular education through the instrument of private schools, "it has a proper interest in the manner in which those schools perform their secular educational function." *Board of Education v. Allen*, 392 U.S. at 247, 88 S.Ct. at 1928. The record reveals that the minimum standards a school must meet in order to obtain state approval, and thereby be in compliance with the compulsory school attendance law, do not violate the tenets of the religion of the members of the Bible Baptist Church. The state's interest in assuring that these minimum standards are being met warrants the requirement that the church school seek and obtain state approval. Absent the approval requirement, the state would have virtually no assurance that children, who are not in attendance at a public school, are in fact attending either a private or parochial school, and, if so, are receiving and will continue to receive a good education in a safe, healthy environment. There is no doubt that the state has the power to impose *reasonable* regulations for the control and duration of a basic education. *Wisconsin v. Yoder*, 406 U.S. at 213, 92 S.Ct. at 1532. (Emphasis added.)

Nevertheless, the parents assert that the state's recognized interest in providing an education for its youth can be achieved through a less restrictive and more precise alternative, namely, a standardized achievement testing program. A close examination of the record reveals that, after careful study, the Department of Public Instruction

saw fit not to implement a standardized achievement testing program nor has the Legislature deemed it an appropriate means to monitor the work of private and parochial schools. The record further discloses that the validity of such tests are, at best, questionable. In light of the record, this court is ill-equipped to determine whether or not standardized achievement tests would provide the state with any assurance that children in attendance at the Bible Baptist School are receiving a good education.

■ The burden on the parents' free exercise of religion in the present case is minimal, and is far outweighed by the state's interest in providing an education for its people. The rights guaranteed by the Free Exercise Clause of the First Amendment are not absolute and totally free from all legislative restrictions. The Constitution does not withdraw from states the power to safeguard their vital interests. The incidental burden on the free exercise of the parents' religion as a result of the state approval requirement is justified under the circumstances by the state's compelling interest in the regulation. The record clearly shows that compulsory school attendance at an approved school would not pose a very real threat of undermining the Bible Baptist Church members' community and religious practices as they exist today. *See* 406 U.S. at 218, 92 S.Ct. at 1534.

Counsel for the defendants has placed considerable reliance on two recent state supreme court decisions which have addressed the inherent conflict between compulsory school attendance regulations and the free exercise of religious beliefs, namely *State v. Whisner*, 47 Ohio St.2d 181, 351 N.E.2d 750 (1976), and *Kentucky State Bd., etc. v. Rudasill*, 589 S.W.2d 877 (Ky.1979). We believe that both cases are distinguishable.

In *State v. Whisner*, parents of children in attendance at the Tabernacle Christian School were convicted of failing to send their children to a school which complied with the "minimum standards" promulgated by the Ohio State Board of Education pursuant to express legislative command.

The Tabernacle Christian School was a non-public religious school which employed a state certified teacher and utilized the ACE method of instruction. The course of study required by the school included mathematics, spelling, English, social studies, history, civics, science, reading, art, music, and physical education. The record in *Whisner* revealed that students registered superior marks on the Stanford Achievement Tests. The church school was in session six hours per day for 180 days a year, and daily attendance was reported to public officials. The school also admitted public officials for the purpose of conducting health, safety, and fire inspections. Nevertheless, the governing statute required that every child "attend a school which conforms to the minimum standards prescribed by the state board of education." Ohio Rev.Code Ann. § 3321.03 (Page 1972). The Tabernacle Christian School had never applied for state approval.

On appeal, the Supreme Court of Ohio reversed the convictions and held that the state's minimum standards relating to the operation of schools infringed upon the defendant-parents' rights to the free exercise of their religion. 351 N.E.2d at 770–71. The court determined that, although the enactment of minimum standards to extol the secular aims of the state and assure that each child obtained a quality education was admirable, the minimum standards far exceeded the bounds of "reasonable regulation" as applied to the Tabernacle Christian School. *Id.* at 764.

The Ohio Supreme Court in *Whisner* recognized that the state was not devoid of all power to promulgate and enforce reasonable regulations which affected the operation of non-public schools, *see* 351 N.E.2d at 760; however, the court determined that Ohio's minimum standards were:

"so pervasive and all-encompassing that total compliance with each and every standard by a non-public school would effectively eradicate the distinction between public and non-public education, and thereby deprive these appellants of their traditional interest as parents to direct the upbringing and education of their children." 351 N.E.2d at 768.

The court in *Whisner* further stated that:

"what the state gives to a non-public school through including a requirement in the 'minimum standards' that the operation of the school must be consistent with its own stated philosophy (EDb–401–02[A] and EDb–401–03[A]), it takes away by compelling adherence to all the 'minimum standards,' the effect of which is to obliterate the 'philosophy' of the school and impose that of the state." 351 N.E.2d at 770.

Ohio's minimum standards for non-public schools regulated not only the content of the curriculum; the manner in which it was taught and by whom; the physical layout of the educational buildings; the hours of instruction; and the educational policies sought to be achieved through the instruction offered, but the standards also regulated the amount of instructional time to be allocated to the subjects offered, almost to the minute. *See* 351 N.E.2d at 764–70. Directing itself to this specific standard, the court asserted that the reasonableness of the "almost to the minute" regulation of instructional time "wanes in the face of an attack premised upon a violation of the constitutional right of appellants to the free exercise of their chosen religion." 351 N.E.2d at 765.

The Ohio minimum standards were self-contradictory and extreme in their effort to achieve equivalency in public and private education. *See* 351 N.E.2d at 766. Unlike the defendants in the case at bar, the parents in *Whisner* clearly demonstrated the manner in which specific minimum standards imposed by statute infringed upon the free exercise of their religion. The state was therefore required to show an interest of sufficient magnitude to override the individual's interest protected by the First Amendment. The state in *Whisner* made no attempt, either at the trial court level or on appeal, to show that enforcement of the minimum standards was justified under the circumstances. 351 N.E.2d at 771.

Moreover, in *Kentucky State Bd., etc. v. Rudasill, supra,* the Supreme Court of Kentucky held that the state could not require non-public schools to comply with curriculum, teaching, and textbook standards because such a requirement would violate Section 5 of the Kentucky Constitution. 589 S.W.2d at 883–84.

Section 5 of the Kentucky Constitution provided in pertinent part as follows:

"nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed;"

North Dakota has no similar constitutional provision.

The parents in the instant case also contend that there is a reason, independent of their argument on First Amendment grounds, which warrants a finding that the compulsory school attendance law is unconstitutional in its application to them. They assert that the right of parents to direct and control the upbringing and education of their children, although not specifically enumerated as such, is a "fundamental" right secured by the concept of liberty guaranteed by the first section of the Fourteenth Amendment to the United States Constitution.

■ While we are cognizant of and have carefully examined the United States Supreme Court decisions which have recognized the traditional right of parents to direct the upbringing and education of their children, *see Pierce v. Society of Sisters, supra; Meyer v. Nebraska, supra; see also Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), we are also aware of the United States Supreme Court's observation in *Yoder* wherein it said that:

"*Pierce* [268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)], of course, *recognized that where nothing more than the general interest of the parent in the nurture and education of his children is involved, it is beyond dispute that the State acts 'reasonably' and constitutionally in requiring education to age 16 in some public or private school meeting the standards prescribed by the State.*" 406 U.S. at 233, 92 S.Ct. at 1542. *See Scoma v.*

*Chicago Board of Education,* 391 F.Supp. 452 (N.D.Ill.1974).

For this reason, we believe that the right of parents to direct the upbringing and education of their children is subject to reasonable state regulation pursuant to the state's police powers. We have not been shown wherein the state's laws are unreasonable.

The United States Supreme Court's holding in *Wisconsin v. Yoder* was limited in scope. The Court placed strong emphasis upon the unique sociological position the Amish maintained in relation to other religious sects, and stressed the fact that the Amish were not a group which claimed to have recently discovered a more progressive or enlightened means by which to raise their children. 406 U.S. at 235, 92 S.Ct. at 1543. The Court determined that the Amish parents had convincingly demonstrated the interrelationship between their sincerely-held religious beliefs and their mode of life, as well as the hazards presented by the enforcement of Wisconsin's compulsory school attendance law to them. *Id.*

The *Yoder* Court further said:

"Nothing we hold is intended to undermine the general applicability of the State's compulsory school-attendance statutes or to limit the power of the State to promulgate reasonable standards that, while not impairing the free exercise of religion, provide for continuing agricultural vocational education under parental and church guidance by the Old Order Amish or others similarly situated." 406 U.S. at 236, 92 S.Ct. at 1543.

In our view, although the parents here have shown that their interest in educating their children in a non-public school is religiously oriented and is therefore an interest protected by the First Amendment, and for the sake of argument only we have assumed that the state laws impose a burden on that interest, they have not shown how the legitimate and compelling interest of the state in educating its people has been unreasonably pursued.

We recognize that courts are ill-equipped to act as school boards and determine the

need for discrete aspects of a compulsory school education program. *See* 406 U.S. at 235, 92 S.Ct. at 1543. The courtroom is simply not the best arena for the debate of issues of educational policy and the measurement of educational quality. Although North Dakota's minimal requirements for state approval of a private or parochial school may be imperfect, without the regulations the state would have no reasonable assurance that its recognized interest in providing an education for its youth is being protected. In time, other means of assuring quality education under circumstances which provide safety and health may evolve, but until such time, this means appears to us to be proper.

The judgments of conviction are affirmed.

PAULSON, PEDERSON, VANDE WALLE and SAND, JJ., concur.

PEDERSON, Justice, concurring specially.

I agree with Chief Justice Erickstad's analysis of the constitutional issues which have been raised in these cases, but I wish to add some personal comments. It is disturbing to me when it appears to be necessary for courts to decide how much the State, under the constitution, can interfere with a person's beliefs. When the Pharisees wanted to trap Jesus, they asked: "Is it lawful to give tribute unto Caesar, or not?" Jesus replied: "Render . . . unto Caesar the things which are Caesar's; and unto God the things that are God's." St. Matthew, chapter 22, verses 17 and 21, King James Version. There are "things" which are obviously "Caesar's" and there are "things" which are obviously "God's." The basic education of children has been, in recent times, thought to be the State's responsibility. Not only the courts, but the Legislature, should reexamine the tradition to determine if perhaps the quality of education can be enhanced by allowing and encouraging the Bible Baptist Church, and other similar church groups, to assume a greater, unhampered role in providing basic education for our children. It appears to be uncontested in this case that Bible Baptist Church's teaching methods produce better results than are produced by the State's current methods. I would prefer that the Legislature make greater efforts to reduce governmental infringements with religious liberties.

SAND, Justice (concurring specially).

I agree with the Chief Justice's opinion but deem it advisable to make additional comments.

I concur in the opinion primarily on the basis that every law is presumed to be valid and the burden of establishing to the contrary rests upon the challenger. In this instance no adequate showing was made by either the parents or their spokesman that compliance with state law impermissibly interfered, or would impermissibly interfere, with the religion of the parents and their children. Whatever effort was made was weakened by the unfortunate use of the expression, "I feel" or "we feel" which connotes emotions or sensations rather than intellectual concepts. This expression was used by both the State's Attorney and the parents.

"Q. So you feel that it—would it be strongly against your religious convictions—

"A. Absolutely.

"Q. —to seek approval of the school, even if approval could be granted?

"A. I feel if—I feel that the supreme power is God, and I feel if he approves the church, that is the arm of the church, he approves the school.

"Q. Okay. I guess I'll just repeat the question. It would be against your religious convictions to seek state approval of the school which Todd is currently attending; is that correct?

"A. Yes, sir."

The responses using the term "feel" in all probability resulted from the State's Attorney's use of the term "feel" in asking the question.

The pastor of the church, in his testimony, stated:

"[We] don't want approval, because we feel it's a matter of state control. Jesus said to Matthew, Chapter 16, 'I will build my church, and the gates of hell will not prevail against it.' We believe the head of the Church is Jesus Christ, and if I let the State become head of the Church, then I will be removing the Lord from His position, and this Church is definitely built on the Lord, Jesus Christ."

I can appreciate that contemporarily the term "I feel" is being used frequently by a good number of people for "I think," "I believe," "It's my judgment," etc. but nevertheless the expression "I feel," unless otherwise defined by the user, has emotional rather than intellectual connotations. In my opinion a constitutional challenge of a state law in order to be successful must rest on something more substantial than emotions or sensations.

In my opinion, this Court has high regard and respect for religion—which I share—and recognizes the constitutional guarantees of the free exercise of religion. First Amendment, United States Constitution, and Sections 4 and 203, North Dakota Constitution. This constitutional right, as well as the others, need to be balanced with the State's interests and rights in the education of persons under a certain age.

My concurrence rests not only on the inadvisable use of the term "I feel" in the foregoing testimony but primarily on the failure of the defendants in this case to illustrate or establish in what manner and by what means the state law impermissibly interferes with the religious convictions of the parents and their children.

VANDE WALLE, Justice, concurring specially.

I concur in all the Chief Justice has written concerning the issues raised in these cases. Although our decision does not necessarily conclude that the applicable North Dakota statutes have utilized the "least restrictive" or "less drastic" means to accomplish the objectives of education, that issue was discussed at length in the briefs and at oral argument. I add these thoughts on

that issue because it may be the significant issue in future decisions.

Counsel for the parents urged that other methods, such as standardized achievement testing, would be a less restrictive method of accomplishing the State's interest in providing a good education for our youth. Whether or not the standardized achievement testing would provide the State with the information necessary is not, as the Chief Justice has noted, revealed in the record. More significantly, however, standardized achievement testing may not, in fact, be the less restrictive alternative to the present statutory requirements. The testing alternative would appear to give the State the authority to require not only that certain basic subjects must be taught but would vest in the State, or some agency other than the school, the authority, through testing, to dictate exactly what will be taught and, as a result, to regulate the thought processes of the students. If the students in the nonpublic schools do not think, and thus respond, on the tests as the State believes they should think and respond, the schools presumably would not meet State standards permitting the students of those schools to be exempt from attendance at the public schools.

It appears to me that a statute requiring nonpublic schools to teach certain basic subjects for a specified minimum number of days, using certified teachers, may be considerably less restrictive and cause less State interference than a requirement whereby the State is empowered to control through testing the precise content of what is to be taught in those schools.