STATE of North Dakota, Plaintiff
and Appellee,

v.

Kathy RIVINIUS and Ronald Weikum,
Defendants and Appellants.

Cr. No. 862.

Supreme Court of North Dakota.

Dec. 17, 1982.

Terry L. Adkins, Asst. Atty. Gen., Bismarck, and James Vukelic, Sp. Asst. Atty. Gen., Mott, for plaintiff and appellee; argued by Terry L. Adkins, Bismarck.

Gibbs & Craze, Cleveland, Ohio, and Boutrous & Halpern, Glen Ullin, for defendants and appellants; argued by David C. Gibbs, Jr., Cleveland, Ohio.

SAND, Justice.

The defendants and appellants, Kathy Rivinius and Ronald Weikum, were charged with and found guilty of violating the North Dakota compulsory school attendance law, § 15–34.1–01, North Dakota Century

Code,[1] by sending their children to the Living Word Academy, a Christian day school not approved by the County Superintendent of Schools and the Superintendent of Public Instruction of North Dakota. The judgment of conviction was entered and the defendants appealed.

The defendants and their families resided in Grant County, North Dakota, within the Elgin Public School District. The defendant parents had control over their children between 25 August and 30 September 1980. During this time the children were between 7 and 16 years of age, but were not attending the Elgin public school or a private or parochial school approved pursuant to NDCC § 15–34.1–03.[2] Instead, the defendants' children were attending the Living Word Academy, a private school not approved by the County Superintendent of School and the Superintendent of Public Instruction of North Dakota.

The Living Word Academy employs a Bible-based Christian educational program. The defendants believe that the Bible is the inspired Word of God and commands them to raise and educate their children in accordance with its precepts. The defendants' primary contention is that they, and not the state, are mandated by God to provide their children with an education. The defendants contended that the curriculum at the Living Word Academy is an integral and inseparable part of their religious beliefs and practices. The defendants believe that God compels them to provide an education for their children where they may be taught all subjects from a Biblical, God-centered perspective; where they may be taught their correct relationship to God and those in authority over them; and where they may be taught Christ-like character qualities and personality traits through the instruction and example of teachers who practice those same traits. Accordingly, the defendants contended that they are commanded by God to send their children to teachers who have not submitted themselves to the state teacher certification process and to a school which has not submitted to the approval process of the North Dakota Department of Public Instruction.

Defendant Weikum, responding to questions, testified:

"Q. Can you relate how it would be violative? Summarize what I think you've already said?

"A. Because of the fact we have the mandate—there is a higher authority than the State, I guess is what it comes down to, and God is that higher authority—and the way God has directed that we go ahead and educate our children, this was, is, according to the Word of God. To allow the State to have a relationship where they could be in between the mandate from the Word of God to the parent would violate my religious freedom in order to be able to do that.

---

**1.** North Dakota Century Code § 15–34.1–01 provides as follows:

"Every parent, guardian, or other person who resides within any school district, or who resides upon any government base or installation without any school district, and has control over any educable child of an age of seven years to sixteen years who does not fall under the provisions of sections 15–34.1–02–04 or 15–34.1–03, shall send or take such child to a public school each year during the entire time such school is in session"

North Dakota County Code § 15–34.1–05 provides as follows:

"Any person failing to comply with the requirements of this chapter is guilty of an infraction."

**2.** North Dakota Century Code § 15–34.1–03(1) provides as follows:

"The parent, guardian, or other person having control of a child required to attend school by the provisions of this chapter shall be excused by the school board from causing the child to attend school whenever it shall be shown to the satisfaction of the board, subject to appeal as provided by law, that one of the following reasons exists:

1. That the child is in attendance for the same length of time at a parochial or private school approved by the county superintendent of schools and the superintendent of public instruction. No such school shall be approved unless the teachers therein are legally certificated in the state of North Dakota in accordance with section 15–41–25 and chapter 15–36, the subjects offered are in accordance with sections 15–38–07, 15–41–06, and 15–41–24, and such school is in compliance with all municipal and state health, fire, and safety laws."

"Q. The other area of concern, the certification of teachers, would it violate your convictional beliefs to have certified teachers teach your children?

"A. Yes; because again of the relationship that the State would want to interpose their requirements in order to determine whether or not we can go ahead and follow a directive that the Word of God sets out. By the State being allowed to do that, that would violate my beliefs."

Defendant Rivinius testified, as pertinent to her belief, in substance as follows:

"Q. I would like to ask you to state to the Court in your own words; what the difficulty is, why you have difficulty with this relationship of the State coming in and approving the education, the educational process of your children.

"A. I do believe like Mr. Weikum, that if we had it approved, it would no longer be under the rule of God, but under the rule of the State." [3]

On appeal, the defendants contended, in substance, that the state laws and regulations as applied to them violated their right to the free exercise of religion and to educate their children as guaranteed by the North Dakota and United States Constitutions.[4]

The First Amendment, made applicable to the states through the Fourteenth Amendment in *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), prevents Congress or state legislatures from enacting laws respecting an establishment of religion or prohibiting the free exercise of religion.

█ Although the freedom to hold religious beliefs is absolute, the freedom to act, even if the action is in accord with religious convictions, is not totally free from legislative restrictions. See, *e.g., Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) [denial of unemployment compensation benefits to Seventh-Day Adventist restricted free exercise of religion and state's interest did not justify restriction]; *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) [free exercise of religion not violated by Sunday closing law]; *Prince v. Commonwealth of Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) [statute prohibiting children under specified age from selling newspapers, magazines, or periodicals in public street did not violate free exercise of religion]; *Cantwell v. Connecticut, supra,* [statute prohibiting solicitation of money for a religious cause unless cause was approved by secretary of public welfare counsel violated free exercise of religion]; *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879)

---

**3.** This is substantially the testimony of the defendants even though the attorney questioning the defendants used the expression, "Do you *feel*," which was criticized in a special concurring opinion in *State v. Shaver,* 294 N.W.2d 883 (N.D.1980), as not constituting a genuine basis for challenging the constitutionality of a law on religious grounds. The New Hampshire Supreme Court, in *State v. Drew,* 89 N.H. 54, 192 A. 629, 631–632, a case involving a compulsory vaccination and attendance law, stated that:

"The defendant's individual ideas whether 'conscientious,' 'religious' or 'scientific,' do not appear to be more than opinions. They are not shown to involve any question of religious liberty. Since they are mere opinions they are irrelevant and immaterial. The defendant's views cannot affect the validity of the statute or entitle him to be excepted from its provisions."

**4.** The First Amendment to the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

The North Dakota Constitution, Article I, § 3, provides:

"The free exercise and enjoyment of religious profession and worship, without discrimination or preference shall be forever guaranteed in this state, and no person shall be rendered incompetent to be a witness or juror on account of his opinion on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state."

[statute prohibiting polygamy did not violate free exercise of religion]; *State v. Shaver*, 294 N.W.2d 883 (N.D.1980) [compulsory school attendance law did not violate free exercise of religion].

■ The resolution of a conflict between the free exercise of religious beliefs and the state's interest in the health, safety, and welfare of its citizens requires a delicate balance to accommodate these interests. *Braunfeld v. Brown, supra; Prince v. Commonwealth of Massachusetts, supra; State v. Shaver, supra.*

In *State v. Shaver, supra,* after an examination of United States Supreme Court decisions involving free exercise issues under the First Amendment, we applied the constitutional analysis and approach utilized in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and *Sherbert v. Verner, supra,* to resolve a conflict between the state's interest in the education of its youth and the fundamental rights and interests protected by the free exercise clause of the First Amendment and the traditional interest of parents with respect to the religious upbringing of their children. We recognized that the constitutional analysis of cases arising under the free exercise clause are generally tailored to their particular factual situation. The constitutional analysis used in *State v. Shaver, supra* at 891, is as follows:

> "... (1) whether or not the activity interfered with by the state is motivated by and rooted in a legitimate and sincerely-held religious belief [citation omitted]; (2) whether or not the parties' ... free exercise of religion had been burdened by the regulation, and the extent or impact on their religious practices [citation omitted]; and (3) whether or not the state had a compelling interest in the regulation which justified the burden on the free exercise of religion and overrode the interest of the ... parents in exercising their religious practices.

5. In *Wisconsin v. Yoder, supra,* and *State v. Shaver, supra,* the state conceded or stipulated

Because of the interrelation of the sincerity of the defendants' belief and the burden on that belief, we will consider these two aspects of the constitutional analysis in conjunction with each other. A consideration of the burden on a religious belief necessarily requires us to consider the sincerity of that belief.[5]

On appeal to this Court, the state contended that the defendants' belief was of extremely short duration and that the testimony offered by the defendants was so inconsistent as to undermine any claim of sincerity as to the belief held by the parents. The state points out that although the defendants objected to compliance with certain state requirements for approval of the Living Word Academy [certified teachers], the defendants do not object to the requirements that the school be in compliance with fire, health, and safety laws; that certain specific subjects be taught; and that courses be taught a minimum number of days during the year. The state also points out that one of the teachers at Living Word Academy was certified in the state of Oklahoma. During oral argument the state conceded that, except for these inconsistencies, the beliefs held by the defendants were sincere religious beliefs.

The defendants responded to the state's contentions of inconsistencies by asserting that as long as there was no conflict between "God's law" and the state's requirements, the parents were not adverse to complying with state requirements. The defendants contended that the requirements they did not object to did not affect their belief that they were given the responsibility by the Word of God to educate their children.

■ As we have observed, the freedom to hold religious beliefs and opinions is absolute; however, actions motivated by those beliefs are not immune from regulation. Only beliefs rooted in religion are protected by the free exercise clause, but religious beliefs need not be acceptable, logical, con-

that the religious beliefs were sincerely held.

sistent, or comprehensible to others in order to merit First Amendment protection. *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). It is not within " 'the judicial function and judicial competence; ... to determine ... the proper interpretation of the Amish faith;' [c]ourts are not arbiters of scriptural interpretation." *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), citing *Thomas v. Review Bd. of Indiana Employment Security Division, supra.* This concept of religious liberty necessarily requires the beliefs, as long as they are religious and not secular, may have a wide divergence among individuals and still be entitled to First Amendment protection. See, *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). However, a showing of a sincerely held religious belief is necessary to prevent a limitless excuse for avoiding all unwanted legal obligations and a group's word cannot automatically be accepted if a religious exemption is at issue. See, *United States v. Kuch,* 288 F.Supp. 439 (D.D.C. 1968), 35 A.L.R.3d 922 [denying a religious exemption from federal drug regulations where extrinsic evidence established that only a tactical pretense of religion was involved: members of the "Neo-American Church" with its heads known as Boo Hoos, the seal of the church was a three-eyed toad, and the church motto was "Victory over Horseshit."]

■ In this instance, the beliefs of the defendants are based on their perspective of accepting God's role into their lives as well as into the education of their children. These beliefs do not express a political, philosophical, or moral preference; but instead represent a conviction rooted in their religious beliefs. Without a contrary showing that the defendants' beliefs are based on anything but religion, and considering that individual beliefs may be divergent, we must accept and assume that the individual defendants hold these beliefs as sincere religious beliefs.

■ Interrelated with the wide latitude afforded a religious belief is the quality and sincerity of the belief and the burden cast upon the belief by the state's laws and regulations. Persons challenging a statute affecting the free exercise of religion must demonstrate the manner in which the state's minimum requirements or standards infringe upon their free exercise of religion. *State v. Shaver, supra.* The quality of the claims concerning the encroachment of the compulsory school attendance laws on the defendants' rights to the free exercise of their religious beliefs is an important consideration. *Wisconsin v. Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533, 32 L.Ed.2d at 25.

In *Wisconsin v. Yoder, supra,* the United States Supreme Court carefully evaluated the quality of the Amish claims concerning the encroachment of Wisconsin's compulsory school attendance statute on their religious beliefs and considered whether or not the Amish religious faith and their mode of life were inseparable and interdependent. The Supreme Court noted that the record supported the Amish claim that the "traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." 406 U.S. at 216, 92 S.Ct. at 1533, 32 L.Ed.2d at 25. The Court in *Yoder,* 406 U.S. at 218, 92 S.Ct. at 1534, 32 L.Ed.2d at 26, went on to observe that:

> "... secondary schooling, by exposing Amish children to wordly influences in terms of attitudes, goals, and values contrary to beliefs, and by substantially interfering with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development, contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child."

In particular, the United States Supreme Court outlined the scope of its decision as follows:

"It cannot be overemphasized that we are not dealing with a way of life and mode of education by a group claiming to have recently discovered some 'progressive' or more enlightened process for rearing children for modern life.

"Aided by a history of three centuries as an identifiable religious sect and a long history as a successful and self-sufficient segment of American society, the Amish in this case have convincingly demonstrated the sincerity of their religious beliefs, the inter-relationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others. Beyond this, they have carried the even more difficult burden of demonstrating the adequacy of their alternative mode of continuing informal vocational education in terms of precisely those overall interests that the State advances in support of its program of compulsory high school education. In light of this convincing showing, one that probably few other religious groups or sects could make, and weighing the minimal difference between what the State would require and what the Amish already accept, it was incumbent on the State to show with more particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish. *Sherbert v. Verner,* supra.

"Nothing we hold is intended to undermine the general applicability of the State's compulsory school-attendance statutes or to limit the power of the State to promulgate reasonable standards that, while not impairing the free exercise of religion, provide for continuing agricultural vocational education under parental and church guidance by the Old Order Amish or others similarly situated." *Wisconsin v. Yoder,* 406 U.S. at 235–236, 92 S.Ct. at 1543, 32 L.Ed.2d at 36–37.

The *Yoder* case represented a conflict between the exercise of religion and a state regulation which threatened the very survival of the Amish faith. A careful reading of *Yoder* establishes that the quality and degree of the Amish beliefs and the burden on those beliefs were, on a symbolic scale of constitutionality, given great weight.

In *State v. Shaver, supra,* the Bible Baptist Church objected to securing state approval of their school as required by state law. However, no attempt was made at trial to demonstrate how compliance with the minimum requirements for state approval set forth in NDCC § 15–34.1–03(1) would affect the religion of the parents or their children. In particular, the record did not disclose a deeply rooted religious conviction against the use of certified teachers in the Bible Baptist School, and the record demonstrated that instruction could be conducted by a certified teacher without violating the basic tenets of the Bible Baptist Church.

Our discussion of the burden on the free exercise of religion in *State v. Shaver, supra* at 895, concluded with the following:

"It appears that while the principles, beliefs, and doctrines held in common by members of the Bible Baptist Church oppose the essential requisite that the Bible Baptist School obtain state approval in order to comply with the compulsory school attendance law, the tenets of their religion do not forbid compliance with any of the specific requirements needed to obtain that approval.

"Pursuant to Section 15–34.1–03, N.D. C.C., a parochial or private school must be approved by the County Superintendent of Schools and the Superintendent of Public Instruction. As the parents have failed to show that the tenets of their religion forbid compliance with the *specific* requirements needed to obtain state approval, it is difficult for us to understand their objection to seeking approval. Nevertheless, the parents contend that requiring the Bible Baptist School to seek state approval violates the tenets of their religion and imposes an impermissible and substantial burden on the free exer-

cise thereof. For the sake of argument, we assume that this requirement is a burden upon the free exercise of their religion." [Emphasis in original.]

In the instant case, the defendants contended that requiring the Living Word Academy to seek state approval and teachers' certification unduly infringed their right to free exercise of religion. The defendants were primarily concerned with the relationship and control by the state over education which, according to their belief, was a religious function.

To obtain state approval of a private or parochial school in North Dakota, the following minimum requirements set forth in NDCC § 15–34.1–03(1) must be met: (1) the teachers are legally certified in North Dakota in accordance with NDCC § 15–41–25 and Ch. 15–36; (2) the subjects offered are in accordance with NDCC §§ 15–38–07, 15–41–06, and 15–41–24; and (3) the school is in compliance with all municipal and state health, fire, and safety laws.

The record reflects that at least one of the teachers employed at Living Word Academy was, or had been, certified in Oklahoma. The record also reflects that the teachers employed at Living Word Academy were "certifiable" in North Dakota. The testimony of Rev. David Keister reflects that Living Word Academy would not necessarily forbid certified teachers, but a certified teacher would have to disavow certification to teach at Living Word Academy. Rev. Keister testified that the qualifications to teach at Living Word Academy included satisfying spiritual qualifications through an interviewing procedure and also satisfying competency qualifications.

The record further reflects that although the law dictates the curriculum that schools must offer, the law does not dictate, nor does the state regulate, the perspective from which the subjects must be taught. Rather, the manner in which the teachers teach their students is defined and controlled by the local school board or the lay controlling board.

In the instant case, the defendants have demonstrated that the tenets of their religion forbid compliance with a specific requirement needed to secure state approval, i.e., teacher certification. Thus, this case presents a different issue than that presented in State v. Shaver, supra. Although we have high respect and regard for the defendants' religious beliefs, we do not believe the burden on those beliefs are of the magnitude demonstrated in Wisconsin v. Yoder, supra. Nevertheless, the defendants have demonstrated that the state laws and regulations, to a degree, impose a burden upon their religious beliefs. Consequently, we must consider and analyze the state's interest in the compulsory school attendance law.

This analysis, as framed in State v. Shaver, supra at 891, is "whether or not the state had a compelling interest in the regulation which justified the burden on the free exercise of religion and overrode the interest of the ... parents in exercising their religious practices." Whenever legitimate legislative objectives are expressed in a statute which imposes a substantial burden on an interest protected by the First Amendment, the legislature must achieve its goal by means which have the least restrictive or "less drastic" impact on the First Amendment freedoms. In re Primus, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); State v. Shaver, supra.

There can be no doubt as to the importance of education for our youth. See, e.g., Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Neither can there be any doubt, and the defendants concede, that the state has an interest in educating its youth. Wisconsin v. Yoder, supra; Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

Article VIII of the North Dakota Constitution deals with education and contains a constitutional mandate to provide a system of schools and education within the state.[6]

Article VIII, § 1 of the North Dakota Constitution recognizes that "a high degree of intelligence, patriotism, integrity and morality on the part of every voter in a government by the people" is necessary "in order to insure the continuance of that government and the prosperity and happiness of the people."

Article VIII, § 2 of the North Dakota Constitution imposes a mandate upon the legislature to provide a uniform system of free public schools throughout the state, beginning with primary schools and extending through all grades.

Article VIII, § 3 of the North Dakota Constitution provides that instruction shall be given, as far as practicable, in those branches of knowledge that tend to impress upon the mind the vital importance of truthfulness, temperance, purity, public spirit and respect for honest labor of every kind.

Article VIII, § 4 provides that the legislative assembly shall take such other steps as may be necessary to prevent illiteracy, secure a reasonable degree of uniformity in course of study, and to promote industrial, scientific, and agricultural improvements.

■ These constitutional provisions all disclose that the state has a compelling interest in requiring minimum standards of education to insure adequate education of the children of the state to enable them to be viable citizens in the community.[7] Nevertheless, the state's interest is not free from a balancing process when it impinges on fundamental rights and interests such as the free exercise clause of the First Amendment. *Wisconsin v. Yoder, supra; State v. Shaver, supra.*

■ The North Dakota constitutional provisions relating to education have at least equal standing with Article I, § 3 and § 4 of the North Dakota Constitution guaranteeing freedom of religion and freedom of speech and press. We take note that when this constitutional provision was adopted by the state of North Dakota upon

6. Article VIII, §§ 1, 2, 3, and 4 of the North Dakota Constitution provide in their entirety as follows:

"Section 1. A high degree of intelligence, patriotism, integrity and morality on the part of every voter in a government by the people being necessary in order to insure the continuance of that government and the prosperity and happiness of the people, the legislative assembly shall make provision for the establishment and maintenance of a system of public schools which shall be open to all children of the state of North Dakota and free from sectarian control. This legislative requirement shall be irrevocable without the consent of the United States and the people of North Dakota.

"Section 2. The legislative assembly shall provide for a uniform system of free public schools throughout the state, beginning with the primary and extending through all grades up to and including schools of higher education, except that the legislative assembly may authorize tuition, fees and service charges to assist in the financing of public schools of higher education.

"Section 3. In all schools instruction shall be given as far as practicable in those branches of knowledge that tend to impress upon the mind the vital importance of truth-

fulness, temperance, purity, public spirit, and respect for honest labor of every kind.

"Section 4. The legislative assembly shall take such other steps as may be necessary to prevent illiteracy, secure a reasonable degree of uniformity in course of study, and to promote industrial, scientific, and agricultural improvements."

7. In *State ex rel. Nagle v. Olin*, 64 Ohio St.2d 341, 415 N.E.2d 279 (1980), the Court held that the minimum standards of Ohio's compulsory education law went further than necessary to assure the state's interest in education of its children. Significantly, the *Nagle* court, *supra* 415 N.E.2d at 288, stated:

"Additionally the state board might refer to the North Dakota regulatory scheme approved in *State v. Shaver, supra.* That scheme required the issuance of state approval of a private or parochial school upon a showing that (1) all teachers are legally certified, (2) courses are offered in a prescribed range of secular subjects, and (3) the school is in compliance with all municipal and state health, fire, and safety laws."

Thus, while the North Dakota regulatory scheme was not directly involved, it nevertheless received the approval of a court which had, in two instances, decided against the state regulatory scheme in Ohio.

being granted statehood, it was tacitly approved and is in harmony with the First Amendment to the United States Constitution. We also take note that this was accomplished after the decision in *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1879)[8] was handed down. We also observe that the constitutional guarantees of religious freedom rank equal with the constitutional provisions relating to free speech and press.

 This illustrates that the interest of the state and the interests of individuals regarding their religious beliefs or convictions must be harmonized and balanced with the interests of the state so as to preserve the separate interests as much as possible without infringing upon the respective rights more than is necessary. The interests of neither one is absolute. We believe the stated constitutional mandate and objective establishes the compelling state interest and outbalances the resulting strain or imposition on the defendants' religious beliefs. Under the posture of this case we have available to us no other viable alternatives.

Nevertheless, the defendants strenuously contended that the state's recognized interest in educating its youth can be achieved through a less restrictive and more precise alternative, *i.e.,* nationally standardized achievement tests.[9] The defendants contended that the Living Word Academy provides a "Christian education that is academically equal, if not superior to the education afforded in North Dakota's public schools," and that the results on the achievement tests demonstrated that the students' education at the Living Word Academy was above the national average. The defendants also contended that the use of nationally standardized achievement tests is not an infringement upon their religious beliefs.

We recognize that neither certified teachers nor standardized testing are perfect

means to insure the end sought to be attained. Neither one is an exact science, but is concerned with probabilities. Each method which purports to measure learning can be questioned as to its validity.

Standardized testing ordinarily does not result in the discovery of a deficiency in education until after the term, semester, or the school year is over, which would, in effect, result in a child wasting its period of time if the results of the standardized test indicated that the child's education was deficient. We do not believe such a result would satisfy the state's interest in educating its youth.

Although we are cognizant that teacher certification may also have its deficiencies, we believe that teacher certification is an acceptable method of satisfying part of the constitutional mandate to the legislature to properly provide an education for its youth.

The defendants state in their brief that certification of teachers and state approval "would require the school [the Academy] to subject itself to the approval of an educational system that is based and inundated with the anti-religious philosophy of secular humanism. Furthermore, the Academy would be required to hire teachers who had been given the stamp of approval by that same system." However, the defendants do not specifically object to the minimum units of study required and set out in NDCC § 15–41–24 to meet state approval and other basic requirements pertaining to health and safety. We, therefore, assume that the defendants primarily object to the teacher certification requirement which is necessary under present law in order for the Academy to qualify for and receive state approval. This invites a careful examination of what precisely or implicitly is required for certification under the state law.

The Superintendent of Public Instruction of the State of North Dakota, in consulta-

8. *Reynolds v. United States, supra,* involved the Mormon practice of polygamy. The United States Supreme Court held that a party's religious belief cannot be accepted as justification for committing an overt act made criminal by the law of the land.

9. The 1981 Legislature considered H.B. 1608 which, in substance, would have permitted standardized tests as an alternative to teacher certification.

tion with the Teachers Professional Practices Commission determines the criteria[10] for teachers' certification. These standards must include consideration of character, adequate educational preparation, and general fitness to teach. NDCC § 15–36–01. We have serious reservations that anyone truly concerned with educating children would object to the teacher having the above listed qualifications or would not want the teacher to have them. None of the criteria or standards signify, even remotely or otherwise, of being "based and inundated with the anti-religious philosophy of secular humanism" nor does the record contain any evidence suggesting to the contrary.

The criteria for certification must be based upon the above listed statutory qualifications. Furthermore, a public hearing is required before the Superintendent may issue rules and regulations concerning the issuance of a teacher's certificate. We also have serious reservations that the North Dakota public will endorse, promote, or recommend any rule or regulation which would encompass any "anti-religious philosophy of secular humanism."

Private or parochial schools are not constrained by the same manner as are public schools and may have religious activity, training, or teaching conducted as part of the curriculum in addition to the subjects required to be taught by law.

In any event, the lay controlling board (comparable to the public school board yet not limited or governed by laws applicable to public schools) has the authority to insist, as a condition of employment, that the certified teacher use methods and standards of teaching which will further their religious beliefs and convictions or be compatible with them. The statutory provisions governing the relationship between school boards and teachers regarding contracts do not apply to private or parochial schools. See *Schauer v. Jamestown College*, 323 N.W.2d 114 (N.D.1982). The lay controlling board is in a position to take any valid precautionary measures to insure that the teaching will be compatible with the religious beliefs and convictions. This is, or would be, a matter between the certified teacher and the board.

Neither party has brought to our attention any constitutional, statutory, or regulatory provision or policy prohibiting the lay control board from requiring the certified teacher in a private or parochial school to include the teaching of religious subjects, or to teach in a manner compatible with their beliefs. Neither have we found any. The lay board could monitor the classroom to insure that the teaching conform with their agreed understanding or contract and take whatever legal action is necessary if the need arises.

The record contains no evidence that any certified teacher, after having been approached or requested to teach in the manner and style philosophically satisfactory and compatible with the religious beliefs, including the conscience of the defendants and others similarly situated, declined to do so or expressed any thought that the certification interfered with or prohibited such conduct.

The current statutes, and especially the state certification provisions, including the required oath[11] of the teacher do not prevent or discourage any approach or effort in that direction.

The grounds for revocation of a teacher's certificate are contained in NDCC § 15–36–15, and upon examination we find that they appear to be compatible with the stated

10. We have taken judicial notice of the material found in Guidelines & Regulations for North Dakota Educator's Professional Certificate as revised 1 August 1981, and criteria used in issuing teachers certificates.

11. Each teacher seeking certification must subscribe to an oath or affirmation to support the Constitution of the United States and the state of North Dakota and faithfully discharge the duties of a teacher according to the best of his ability. Such an oath does not prevent any certified teacher from teaching in a style or manner in conformity and compatible with the defendants' beliefs and convictions, nor does this oath prevent the teacher from teaching subjects other than the ones specified by the state.

goals of the defendants' expressed religious beliefs and convictions.

■■■ The purpose or effect of the state statutes and regulations on certification of teachers is to promote and further the education of the children. The purpose is not to impede the observance of one or all religions or to discriminate invidiously between religions, which is prohibited by *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).

In determining whether or not certain laws or regulations create an unreasonable or undue burden upon an individual's religious freedom as guaranteed by the Constitution, even though we recognize, respect and have high regard for an individual's religious beliefs and convictions, we nevertheless, out of necessity, must apply an objective test to the facts established.

After a careful review of the constitutional guarantees and the case law on the subject, we conclude that under the present laws the state does not unreasonably interfere with the liberty of parents in the upbringing and education of their children and that the present laws do not unduly impinge on the constitutional rights of the defendants. In reaching this conclusion, we confined ourselves only to the material and specific challenges submitted because we believe that the courts, unlike in apportionment matters, are in a relatively poor position or ill-equipped to fashion a remedy which neither party has advocated. Such innovative remedies generally should be sought through the legislative process. We are primarily concerned whether or not the present law involved is valid. We conclude it is. If a better solution is available which will have an even lesser effect on the religious beliefs than the present law under consideration, it should be through the legislative process. We are not implying or intimating that the legislature may not work out a system that will be satisfactory to both sides—meaning the state and the defendants—and still accomplish the constitutional mandate.

As we stated in *State v. Shaver, supra* at 900, "In time, other means of assuring quality of education under circumstances which provide safety and health may evolve, but until such time, this means appears to us to be proper."

Accordingly, we affirm the judgment of conviction.

ERICKSTAD, C.J., and PAULSON, VANDE WALLE, JJ., concur.

PEDERSON, Justice, concurring specially.

Often in the law business, where tradition and precedent are significant, situations must be confronted which are especially frustrating. This case illustrates some of the things that are frustrating for me. In that respect it is analogous to cases in which we are obligated to apply the exclusionary rule and thus prevent the truth from being shown in order to accomplish a collateral purpose. See debate on exclusionary rule by Kamisar, Wilkey, Canon and Schlesinger in 62 Judicature at pages 66, 214, 337, 351, 398, 404 (1978).

Even though a statute may be invalid, precedent prevents us from acknowledging it when those urging the invalidity do not have "standing" or, something very similar, they have been unable to show that the invalidity prejudiced them. In *Hjelle v. Sornsin Construction Company,* 173 N.W.2d 431 (N.D.1970), at syllabus 1, this court held:

"The general rule is that a litigant may assert only his own constitutional rights or immunities. As the Highway Commissioner has presented no weighty countervailing policies to cause an exception to that rule, it is held that he has no standing to assert the constitutional rights of adverse parties."

What gives the Amish standing, in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), which Kathy Rivinius and Ronald Weikum do not have? Apparently it is the depth, quality and sincerity of their belief. I do not know who is qualified to make this evaluation—but, under our rules, the trial judge who heard and saw them testify must make it in the first in-

stance, and there is a presumption that he made the evaluation correctly. The fact that Kathy's and Ronald's convictions were not described in the same terms—apparently as was the Amish conviction—militates against them when they ask that this court reverse the conclusions reached by the trial court.

The State has argued that Kathy's and Ronald's beliefs are short-standing. The Amish traditions demonstrated sincerity because, in part, they had been practiced for three centuries. Kathy and Ronald did not argue that their tradition (Christianity) has been practiced for over nineteen centuries.

The State further argued that inconsistencies detracted from the sincerity of Kathy's and Ronald's beliefs. Apparently, when the case was being presented to the trial court, there was no effort made to show that, when judged under worldly standards, there are few Christian principles which cannot be made to appear wholly inconsistent.

If I had been the trial judge in this case, my powers of discernment would have led me to distinguish between Kathy's and Ronald's sincerity and that of the "Boo Hoos" of the "Neo-American Church" (*United States v. Kuch,* 288 F.Supp. 439 (D.D.C.1968)), but not between Kathy's and Ronald's sincerity and that of the Amish (*Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)). If it were appropriately raised, I would not hesitate to rule that the requirements of Article VIII, § 3, of the North Dakota Constitution relating to teaching "truthfulness, temperance, purity, public spirit, and respect for honest labor of every kind," are not being met by public schools. But I must stay with the rules that limit my authority as an appellate judge. Because we cannot substitute our judgment for that of the trial court, I concur in the majority opinion authored by Justice Sand.