STATE of North Dakota, Plaintiff and Appellee,

v.

Thomas PATZER, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Peggy PATZER, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Raymond LARSEN, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Lorita LARSEN, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Richard REIMCHE, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Kathy REIMCHE, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Gerald LUND, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Sheryl LUND, Defendant and Appellant.

Cr. Nos. 1096–1099 and 1101–1104.

Supreme Court of North Dakota.

Feb. 20, 1986.

John R. Gregg, Bottineau, for plaintiff and appellee in Nos. 1101–1104.

Richardson, Blaisdell, Isakson & Lange, Hazen, for defendants and appellants in Nos. 1101–1104; argued by Gregory L. Lange.

Charles J. Gilje, Jamestown, for plaintiff and appellee in Nos. 1096–1099.

Richardson, Blaisdell, Isakson & Lange, Hazen, and J. Douglas Alexander, Sidney, Mont., for defendants and appellants in Nos. 1096–1099; argued by Gregory L. Lange.

LEVINE, Justice.

The defendants in these consolidated appeals,[1] parents who refused to send their

---

1. Pursuant to the defendants' request, we will treat their appeals as consolidated.

children to school and instead sought to educate them in their homes, were convicted of violating North Dakota's compulsory school attendance laws, Chapter 15–34.1, N.D.C.C. None of the parents is a certified teacher or presently certifiable under state law, nor are their children being taught by certified teachers in the homes. The parents assert that their convictions should be reversed because the compulsory school attendance laws, as applied to them, unconstitutionally infringe upon their religious beliefs. We conclude that the state has an interest in the teacher certification feature of the compulsory school attendance laws which is of sufficient magnitude to override the burden imposed upon the religious interests claimed by the parents under the circumstances and, accordingly, affirm the judgments of conviction.

Tom Patzer and Peggy Patzer and Ray Larsen and Lorita Larsen were convicted in a consolidated bench trial in Stutsman County. The Patzers are Seventh Day Adventists and the parents of Jeremy, age eight at the time of trial. Peggy Patzer has taken two years of college instruction. Tom Patzer has a masters degree in divinity and at the time of trial served as pastor of the Seventh Day Adventist Church in Jamestown. Ray Larsen and Lorita Larsen are also Seventh Day Adventists and the parents of Michael and Brian, ages nine and seven respectively at the time of trial. Lorita Larsen has a bachelor of science degree in nursing. Ray Larsen is an ophthalmologist practicing in Jamestown. Although there is a state-approved Seventh Day Adventist School in Jamestown, the Patzers and Larsens chose not to send their children to it because of their religious beliefs.

Richard Reimche and Kathy Reimche and Gerald Lund and Sheryl Lund were convicted in a consolidated bench trial in Bottineau County. The Reimches attend the Lutheran Brethren Church in Bottineau and are the parents of Rachel and Joshua, ages eight and ten respectively at the time of trial. Richard Reimche has a high school diploma and has taken one year of post-high school instruction. Kathy Reimche has a high school diploma. Gerald Lund and Sheryl Lund are members of the Bottineau Seventh Day Adventist Church and are the parents of Naleah, age eight at the time of trial. Sheryl Lund has had one and one-half years of college education, and Gerald Lund has a high school diploma. Although the Reimche and Lund children had previously attended public schools, their parents decided for religious reasons to remove them from school.

The parents essentially believe that God has given them sole responsibility to educate their children. They fear that their children, by attending school at an early age, will become "peer socialized" and will accept the values and beliefs of their classmates rather than those of their parents. Peer socialization, they believe, will preclude their children from gaining the religious values the parents believe are essential to the spiritual salvation of their children. The parents testified that their children could be educated outside of the home at some point, but the ages at which they believed this could be accomplished varied, essentially depending upon when the particular child was mature enough to resist peer pressure.

Dr. Raymond Moore, president of the Hewitt Research Foundation; Dr. Donald Erickson, a professor in the Graduate School of Education at U.C.L.A.; and Rousas John Rushdoony, president of the Chalcedon Foundation, testified on behalf of the defendants. The essence of their testimony was that children under the age of thirteen are more susceptible to peer dependency than are children above that age, and that peer dependency could adversely affect their religious values; that home education, mainly because of the one-to-one relationship between teacher and child, is the most effective means of educating a child; and that the state teacher certification requirements are unnecessary for a parent to successfully educate a child in the home. Dr. Moore testified that he had reviewed the educational procedures used by each family and found them adequate to secure a sound education for the children.

At the outset, we note that the issue in the present case is not whether the state may constitutionally impose a total prohibition of a home study alternative to institutional education. During oral arguments, counsel for the defendants informed us that the state has given approval to several home schools in which children are being instructed by persons who hold teaching certificates. The issue in this case is the narrower one of whether the parents, because of their religious beliefs, have the right to educate their children at home without complying with a law requiring certification of all persons who give instruction to children within the state.[2]

Resolution of a conflict among the state's interest in its compulsory education laws, the fundamental rights and interests protected by the free exercise clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children necessitates a three-fold inquiry: (1) whether the activity interfered with by the state is motivated by and rooted in a legitimate and sincerely-held religious belief; (2) whether the parents' free exercise of religion has been burdened by the regulation, and the extent of or impact of the burden on their religious practices; and (3) whether the state has a compelling interest in the regulation which justifies the burden on the free exercise of religion and overrides the interest of the parents in exercising their religious practices. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972);

---

**2.** Section 15–34.1–03(1), N.D.C.C., provides an exception to the compulsory school attendance law when it is shown to the satisfaction of the school board:

"1. That the child is in attendance for the same length of time at a parochial or private school approved by the county superintendent of schools and the superintendent of public instruction. No such school shall be approved unless the teachers therein are legally certificated in the state of North Dakota in accordance with section 15–41–25 and chapter 15–36, the subjects offered are in accordance with sections 15–38–07, 15–41–06, and 15–41–24, and such school is in compliance with all municipal and state health, fire, and safety laws."

The state in this case has not asserted that a home school does not fall within the meaning of "a parochial or private school," and we therefore do not consider the question. Courts in other jurisdictions have reached divergent results when considering similar issues. *See, e.g., Burrow v. State*, 282 Ark. 479, 669 S.W.2d 441 (1984) [course of home study conducted by parents for their own child did not constitute a "public, private or parochial school" within meaning of statute]; *Delconte v. State*, 313 N.C. 384, 329 S.E.2d 636 (1985) [statutes providing that attendance at a "private church school or school of religious charter" or at a "qualified nonpublic school" satisfies compulsory school attendance requirement did not preclude home instruction]; Annot., 65 A.L.R.3d 1222 (1975). Constitutional challenges in those jurisdictions where the compulsory school attendance statutes had been interpreted as imposing a total prohibition on home schooling have been unsuccessful. *See Duro v. Dist. Atty., Second Jud. Dist. of N.C.*, 712 F.2d 96 (4th Cir.1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 998, 79 L.Ed.2d 230 (1984) [state, which prohibited home schooling, had demonstrated an interest in compulsory education sufficient to override parents' religious interests and free exercise claim]; *Burrow v. State, supra* [statute prohibiting home instruction did not violate parent's first amendment free exercise rights]; *State v. Edgington*, 99 N.M. 715, 663 P.2d 374 (Ct.App.), *cert. denied*, 464 U.S. 940, 104 S.Ct. 354, 78 L.Ed.2d 318 (1983) [statute prohibiting home instruction did not violate equal protection clause]. Efforts to have courts recognize a fundamental constitutional right on the part of parents to educate their children at home premised on the penumbra of the first nine amendments and Fourteenth Amendment to the United States Constitution have also been unsuccessful. *See Hanson v. Cushman*, 490 F.Supp. 109 (W.D.Mich.1980); *Scoma v. Chicago Board of Education*, 391 F.Supp. 452 (N.D.Ill.1974); *but see* Devins, *A Constitutional Right to Home Instruction?*, 62 Wash.U.L.Q. 435 (1984); Stocklin-Enright, *The Constitutionality of Home Education: The Role of the Parent, the State and the Child*, 18 Willamette L.J. 563 (1982).

We note that the North Carolina, Arkansas, and New Mexico statutory schemes at issue in *Duro, Burrow*, and *Edgington*, have since been altered, either by court decision or legislative enactment, to specifically allow for the home schooling alternative. *See Delconte, supra;* Ark. Stat.Ann. § 80–1503.4 (1985); N.M.Stat.Ann. §§ 22–1–2(U) and 22–1–2.1 (1985).

The defendants in this case have not challenged the state's curriculum requirements or the requirement that their schools be in compliance with all municipal and state health, fire and safety laws. We proceed on the assumption that the teacher certification requirement is the sole impediment precluding these parents from educating their children at home.

*State v. Rivinius*, 328 N.W.2d 220 (N.D. 1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); *State v. Shaver*, 294 N.W.2d 883 (N.D.1980).

Counsel for the state in these cases have conceded, and we will therefore assume for purposes of argument, that the parents' decisions not to enroll their children in state-approved schools but to educate them in their homes are motivated by sincerely-held religious beliefs.[3]

The state contends, however, that the defendants have failed to establish that the compulsory attendance statutes impose a burden upon the free exercise of their religious beliefs. We disagree.

The nature of the burden on the defendants' religious beliefs in this case differs from that claimed by the defendants in *Rivinius* and *Shaver*. In those cases it was the very concept of state regulation and approval of the religious schools involved which was abhorrent to the religious beliefs of the defendants. There is no doubt that parents do not have the right to be completely unfettered by reasonable governmental regulations as to the quality of the education furnished their children. In *Pierce v. Society of Sisters*, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1077 (1925), the Supreme Court held that although parents have a right to send their children to schools other than public institutions, the state nevertheless has the power "reasonably to regulate all schools, [and] to inspect, supervise, and examine them, their teachers and pupils; ..." Thus, in *Shaver*, where the defendants had failed to show that the tenets of their religion forbade compliance with the specific requirements needed to obtain state approval, and where certified instructors were available and could teach in the religious school without violating the tenets of the defendants'

religion, this court assumed for purposes of argument *only* that seeking state approval imposed a burden upon the defendants' religious beliefs. In *Rivinius, supra*, 328 N.W.2d at 227, where the defendants had shown that the tenets of their religion forbade compliance with the teacher certification requirement needed to secure state approval, but where the instructors in the religious school involved were in fact certifiable under state law, this court held that the defendants had "demonstrated that the state laws and regulations, to a degree, impose a burden upon their religious beliefs."

In the present case, the defendants do not object to state supervision in general. The parents do not claim that even if they had the requisite qualifications to become certified teachers under state law, the act of seeking certification itself would violate their religious convictions. Rather, the claim made here is that the teacher certification requirement imposes a substantial burden upon the parents' religious beliefs, which dictate that they educate their children at home, insulated from religiously adverse peer pressure they believe is present in institutional school settings, because they do not have at the present time and cannot obtain without substantial hardship the educational requirements necessary for teacher certification and, therefore, state approval of their home schools.

■■■ An indirect burden upon one's religious beliefs occurs when compliance with a challenged law or regulation is not inherently inconsistent with those beliefs, but the law or regulation operates so as to make more practically difficult the practice of those religious beliefs. *See generally Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). Nevertheless, "[i]f the purpose or effect of a law is to

---

**3.** The County Court of Stutsman County held that the Patzers' and Larsens' actions were motivated by closely-held and deeply-rooted religious convictions and that the state's compulsory education laws burdened those beliefs. But the court concluded that the state's interest in the law was sufficient to override the defendants' free exercise claims.

The County Court of Bottineau County, however, appears to have held that the actions of the Reimches and Lunds were motivated by "an idealogical or philosophical belief" rather than a sincerely held religious belief and that the compulsory attendance statutes did not create a burden upon their religious beliefs.

impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect." *Braunfeld, supra,* 366 U.S. at 607, 81 S.Ct. at 1148, 6 L.Ed.2d at 568. *See also Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965, 970 (1963). We conclude that the parents in this case have demonstrated a burden, albeit an indirect one, upon their religious beliefs sufficient to require us to balance that burden against the state's interest in the teacher certification requirement.

▪ Our next inquiry is whether "there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15, 24 (1972). Only a compelling state interest can justify burdening the free exercise of religion and the state must bear the burden of demonstrating the unavailability of less restrictive means of achieving its aims. *Sherbert, supra,* 374 U.S. at 403, 407, 83 S.Ct. at 1793, 1795, 10 L.Ed.2d at 972. *See also United States v. Lee,* 455 U.S. 252, 257–258, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127, 132 (1982); *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624, 634 (1981); *Rivinius, supra,* 328 N.W.2d at 227; *Shaver, supra,* 294 N.W.2d at 895.

The state's interest in the education of its children has been characterized as "perhaps the most important function of state and local governments," *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954), and as ranking "at the very apex of the function of a State." *Yoder, supra,* 406 U.S. at 214, 92 S.Ct. at 1532, 32 L.Ed.2d at 24. This court has held that "the state has a compelling interest in requiring minimum standards of education to insure adequate education of the children of the state to enable them to become viable citizens in the community." *Rivinius, supra,* 328 N.W.2d at 228 [Footnote omitted.]

In balancing an individual's right to freely exercise religious beliefs against a state's interest in assuring that its citizens receive quality education, a court performs a sensitive and delicate task. We begin this process of constitutional balancing by examining the factors found to be significant by the United States Supreme Court in *Yoder,* the principal decision relied on by the defendants in urging reversal of their convictions in this case.

In *Yoder,* the Supreme Court held that the state could not enforce its compulsory school attendance law against the parents of Amish teenagers who had completed the eighth grade in the public school system and were then withdrawn from school by their parents. The parents believed, in accordance with the well-established tenets of the Amish religion, that sending their children to public high school would endanger the salvation of both the parents and their children.

The *Yoder* Court indicated that the state's primary compelling interests in the area of education were to "prepare citizens to participate effectively and intelligently in our open political system" and to prepare "individuals to be self-reliant and self-sufficient participants in society." *Yoder, supra,* 406 U.S. at 221, 92 S.Ct. at 1536, 32 L.Ed.2d at 29. However, the Amish had shown a long-established and efficient system of informal vocational education designed to prepare their children for life in the relatively self-contained Amish community. The Amish had a history of three centuries as an identifiable religious sect whose way of life produced successful, self-sufficient, rural communities. Because the Amish children were assimilated into an agrarian society removed from other worldly influences, the values, goals, and attitudes of modern secondary education were found to be in sharp conflict with the fundamental mode of life mandated by the Amish religion.

Significantly, the Court weighed the fact that Amish children had attended, and

would continue to attend, public schools through the eighth grade, and would continue to receive appropriate vocational education within the Amish community after leaving the public school system. The Court pointed out that the state could still constitutionally regulate the Amish schools as long as the regulations were "reasonable." *Yoder, supra,* 406 U.S. at 236, 92 S.Ct. at 1543, 32 L.Ed.2d at 37. The Court held that while the state's interest in compulsory education to age sixteen was important, it was not sufficient to outweigh the free exercise claim made by the Amish, with which the brief additional two-year period of formal education was found to interfere.

The relatively small increment of additional schooling required by the state in *Yoder* cannot be overemphasized, because had that factor not been present, it is questionable whether the *Yoder* opinion would have garnered a majority of the Court. Justice White, in a concurring opinion joined by Justices Brennan and Stewart, stated:

> "This would be a very different case for me if respondents' claim were that their religion forbade their children from attending any school at any time and from complying in any way with the educational standards set by the State. Since the Amish children are permitted to acquire the basic tools of literacy to survive in modern society by attending grades one through eight and since the deviation from the State's compulsory-education law is relatively slight, I conclude that respondents' claim must prevail, ..." *Yoder,* 406 U.S. at 238, 92 S.Ct. at 1544, 36 L.Ed.2d at 38 (White, J., concurring).

The circumstances in the case before us lack the exceptional considerations present in *Yoder.* The defendants, unlike the Amish, are not members of a community with a long history of being a successful, self-sufficient segment of society. Furthermore, in *Yoder,* the Amish children attended public school through the eighth grade and then obtained informal yet efficient vocational training to enable them to assimilate into the self-contained Amish community. In this case, none of the children has completed the first eight years of primary education. None of the defendants' beliefs in home education is of long standing, nor have the defendants demonstrated a long history of successful preparation of children outside of schools for life in contemporary society. Although the defendants testified that a formal institutional school education would be appropriate for their children at some point in their lives, that point varied and depended essentially upon when the defendants considered their children of sufficient maturity to withstand exposure to peer pressure. In the meantime, they believe they can sufficiently educate their children even though they lack the qualifications the state has deemed essential for an effective educator.

While we may have no reason to suppose the religious convictions of these parents are any less sincere than those of the Amish, a comparison of the *Yoder* considerations with those circumstances present in this case clearly reveals that the Supreme Court's decision in *Yoder* is not particularly helpful to their cause.

The defendants assert, however, that the state has failed to meet its burden of demonstrating that the teacher certification requirement constitutes the least restrictive means of ensuring that its primary interest in the education of children is met.[4] They claim that teacher certification

---

**4.** The state did not formally introduce any evidence during the trials relating to the "compelling state interest" and "least restrictive means" issues. Rather, arguments were submitted by brief. However, the lack of formal proof on the issues of "compelling state interest" and "least restrictive means" is not necessarily fatal to its case.

A court may take judicial notice of legislative facts in reviewing the constitutionality of legislative schemes. *See* 1 Weinstein's Evidence ¶ 200[04] at pp. 200–20 through 200–21 (1985) [quoting Karst, *Legislative Facts in Constitutional Litigation,* 1960 Sup.Ct.Rev. 75, 84]; Explanatory Note to Rule 201, N.D.R.Evid.; *cf. Montana Auto. Ass'n v. Greely,* 632 P.2d 300, 303

cannot be the least restrictive means of ensuring that the state's children are properly educated because most other states in the country have done away with "stiff" teacher certification requirements for home and private schools.

It has been held that the use of standardized testing of students as an alternative to teacher certification is "wholly inadequate to protect the state's rightful interests" in the proper education of its children. *Johnson v. Charles City Comm. Schools Bd.*, 368 N.W.2d 74, 81 (Iowa 1985). In *Rivinius, supra*, 328 N.W.2d at 229, this court recognized that although neither certification of teachers nor standardized testing is a perfect means to ensure the end sought to be attained, because testing does not reveal possible deficiencies until the end of a school term, standardized testing would likewise not "satisfy the state's interest in educating its youth." *See also Shaver, supra*, 294 N.W.2d at 900; *Fellowship Baptist Church v. Benton*, 620 F.Supp. 308 (D.C.Iowa 1985); *Sheridan Road Baptist Church v. Dept. of Educ.*, 132 Mich. App. 1, 348 N.W.2d 263 (1984); *State v. Faith Baptist Church*, 207 Neb. 802, 301

N.W.2d 571, *appeal dismissed*, 454 U.S. 803, 102 S.Ct. 75, 70 L.Ed. 72 (1981).

We are aware that some states have enacted educational "equivalency" statutes in an attempt to accommodate home schools without requiring certification of parents. *See generally* J. Tobak and P. Zirkel, *Home Instruction: An Analysis of the Statutes and Case Law*, 8 U.Dayton L.Rev. 1 (1982). However, these statutes, which generally provide that children be given instruction "substantially equivalent" to instruction given in public schools or provide that instructors have qualifications "essentially equivalent" to the minimum standards set for public school teachers, have undergone numerous vagueness challenges. *Compare Ellis v. O'Hara*, 612 F.Supp. 379 (D.C.Mo.1985), and *State v. Newstrom*, 371 N.W.2d 525 (Minn.1985), with *Bangor Baptist Church v. State of Maine*, 549 F.Supp. 1208 (D.C.Me.1982), and *State v. Moorhead*, 308 N.W.2d 60 (Iowa 1981). Having local or state officials make subjective evaluations of parents' ability or lack of ability to teach their own children might very well be considered a more restrictive or intrusive method of gauging the qualifications of parents as

(Mont.1981); *Houser v. State*, 85 Wash.2d 803, 540 P.2d 412, 414–415 (1975), *overruled on other grounds, State v. Smith*, 93 Wash.2d 329, 610 P.2d 869, *cert. denied*, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980).

We note also that application of the "least restrictive means" analysis has not been uniform. *See, e.g., United States v. Robel*, 389 U.S. 258, 267, 88 S.Ct. 419, 425, 19 L.Ed.2d 508, 516 (1967) ["It is not our function ... to determine whether an industrial security screening program exhausts the possible alternatives to the statute under review. We are concerned solely with determining whether the statute before us has exceeded the bounds imposed by the Constitution when First Amendment rights are at stake."]; Note, *Less Drastic Means and the First Amendment*, 78 Yale L.J. 464 (1969). The consequences of carrying the "least restrictive alternative" analysis to its logical extreme have been noted by Justice Blackmun:

"I add these comments to record purposefully, and perhaps somewhat belatedly, my unrelieved discomfort with what seems to be a continuing tendency in this Court to use as tests such easy phrases as 'compelling [state] interest' and 'least drastic [or restrictive] means.' ... I have never been able fully to

appreciate just what a 'compelling state interest' is. If it means 'convincingly controlling,' or 'incapable of being overcome' upon any balancing process, then, of course, the test merely announces an inevitable result, and the test is no test at all. And, for me, 'least drastic means' is a slippery slope and also the signal of the result the Court has chosen to reach. A judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike legislation down. This is reminiscent of the Court's indulgence, a few decades ago, in substantive due process in the economic area as a means of nullification.

"I feel, therefore, and have always felt, that these phrases are really not very helpful for constitutional analysis...." *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 188–189, 99 S.Ct. 983, 993, 59 L.Ed.2d 230, 244 (1979) (Blackmun, J., concurring).

We make this observation only to emphasize the care with which the "least restrictive means" analysis must be employed.

**639**

educators than the present teacher certification requirement.

The state has the power to impose reasonable regulations as to the quality of the education and instruction furnished. In *Meyer v. Nebraska,* 262 U.S. 390, 400, 43 S.Ct. 625, 627, 67 L.Ed. 1042, 1045 (1923), the Supreme Court stated that "[p]ractically, education of the young is only possible in schools conducted by especially qualified persons who devote themselves thereto." While a teaching certificate is no guarantee that the holder is a competent teacher, it does guarantee that the holder has been exposed to the knowledge that a competent teacher should have. *See Benton, supra.* We believe that the teacher certification requirement for instructors in public, non-public, or home schools is a reasonably narrow one and is amply justified. *See Jernigan v. State,* 412 So.2d 1242 (Ala. Crim.App.1982). Teacher certification appears to us to be among the least personally intrusive methods now available to satisfy the state's prime interest in seeing that its children are taught by capable persons.

It is one thing to argue that state government should honor the good-faith efforts of parents to educate their children at home without requiring those parents to hold a teaching certificate. Indeed, ours is a diverse, ever-changing society and every reasonable effort should be made to accommodate those with disparate religious or philosophical beliefs and practices. However, to claim that the state's failure to alter or abolish the teacher certification requirement under these circumstances has resulted in the violation of constitutional rights is another matter. Balancing the defendants' religious beliefs and the nature of the burden imposed upon those beliefs by the teacher certification requirement against the state's interest in certification as a means of ensuring that its children are educated by capable persons, we find the balance in this case tips in favor of the state.[5]

The judgments of conviction are affirmed.

ERICKSTAD, C.J., and VANDE WALLE, GIERKE and MESCHKE, JJ., concur.

---

5. The defendants have also claimed that their convictions should be reversed because they are in violation of Article I, Section 3 of the North Dakota Constitution. The extent of their argument is to quote that section in their brief and state that it is "a parallel provision" to the First Amendment. We deem this insufficient to raise for our consideration the state constitutional issue, and we decline to address it. *E.g., Jones v. North Dakota Workmen's Comp. Bureau,* 334 N.W.2d 188 (N.D.1983). *See generally State v. Jewett,* —— Vt. ——, 500 A.2d 233 (1985).